Gary T. BINGAMAN, Eldon H. Kern, Edmund W. Price, William T. Arps, George A. Berry, James L. Coulter, John D. Fowler, Jerry W. Lunceford, Matthew L. Hillman, Eron S. Paul, Stephen J. Schleif, Robert E. Young, Thomas A. Adair, Mark R. Curtin, Danny E. Fletcher, Kenneth W. Lanning, James T. Mason, Wendel L. Ruegsegger, Edmond R. Smith, Bunnie B. Stanfield, Steven G. Starr, Daniel L. Uptegrove, Daniel R. Williams, Thomas L. Heldenbrand and Stephen J. MacDonald, Petitioners,

v.

**DEPARTMENT OF THE TREASURY,** Respondent.

No. 96–3368.

United States Court of Appeals, Federal Circuit.

Sept. 23, 1997.

Chris Kronberg, Cosho, Humphrey, Greener & Welsh, P.A., Boise, ID, for petitioners.

Thomas D. Dinackus, Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, Washington, DC, for respondent. With him on the brief were Frank W. Hunger, Assistant Attorney General, David M. Cohen, Director, James M. Kinsella, Assistant Director. Of counsel on the brief was Tom F. Dower, Office of Associate Chief Counsel, U.S. Customs Service, Houston, TX.

Before RICH, PLAGER, and BRYSON, Circuit Judges.

BRYSON, Circuit Judge.

This case requires us to address petitions for review in four consolidated cases from the Merit Systems Protection Board, *Bingaman v. Department of the Treasury,* No. DA–0831–95–0675–I–2; *Arps v. Department of the Treasury,* No. DA–0842–96–0058–I–2; *Kern v. Department of the Treasury,* No. DA–0831–96–0063–I–2; and *Adair v. Department of the Treasury,* No. DA–0842–96–0068–I–2. In each case, employees of the Customs Service, within the Department of the Treasury, contend they are eligible for law-enforcement officer (LEO) retirement benefits. The Board denied relief in all four cases. We agree with the Board with respect to each group of petitioners and therefore affirm.

I

The petitioners in all four cases work as either Detection Systems Specialists (Airborne) (DSSAs) or Supervisory DSSAs for the Customs Service. DSSAs spend a major portion of their working time aboard aircraft, using on-board surveillance equipment to identify suspected drug smugglers. From their airborne posts, the DSSAs identify particular aircraft or boats as likely smuggling vessels and relay their findings to ground crews that apprehend the suspected smugglers. The DSSAs do not conduct the apprehension of the suspected smugglers on the ground and do not have direct personal contact with suspects.

Two of the petitioners, Gary T. Bingaman and Eldon H. Kern, are covered by the Civil Service Retirement System (CSRS) and are therefore seeking LEO benefits under 5 U.S.C. § 8336(c)(1) and the regulations pertinent to that statute. The rest of the petitioners are covered by the Federal Employee Retirement System (FERS) and are therefore seeking LEO credit under 5 U.S.C. § 8412(d)(2) and the regulations promulgated under that statute.

Under both the CSRS and the FERS, an employee who qualifies for LEO retirement credit is eligible to retire upon attaining age 50 and completing 20 years of LEO service. *See* 5 U.S.C. §§ 8336(c), 8412(d)(2). By contrast, most civil service employees are eligible to retire at age 60 with 20 years of service or age 55 with 30 years of service. *See* 5 U.S.C. § 8336(a), (b); *id.* § 8412(a), (b). An employee who qualifies for LEO retirement receives a larger annuity than ordinary civil service employees, but is subject to larg-

er deductions from salary during the employee's period of service. In addition, an LEO employee is subject to mandatory early retirement. *See* 5 U.S.C. §§ 8334(c), 8425. An employee can qualify for LEO retirement credit either by serving in a position that has been approved as an LEO position or by applying for LEO credit and satisfying the employing agency that he is entitled to LEO retirement status. *See* 5 C.F.R. §§ 831.903–.906, 831.910(a), 842.803–.804, 842.807(a).

The standards for LEO eligibility differ somewhat between the CSRS and the FERS. The statutory standard for LEO eligibility under the CSRS requires that the duties of the employee's position be "primarily the investigation, apprehension, or detention of individuals suspected or convicted of [federal] offenses." 5 U.S.C. § 8331(20). The statutory standard for LEO eligibility under the FERS is similar in pertinent part, but additionally requires that the duties of the employee's position be "sufficiently rigorous that employment opportunities are required to be limited to young and physically vigorous individuals." 5 U.S.C. § 8401(17).

Pursuant to statutory authorization, *see* 5 U.S.C. §§ 8347(a), 8461(g), the Office of Personnel Management (OPM) has promulgated regulations that explicate the statutory standards under both systems. Both sets of regulations specify that the definition of law enforcement officer "does not include an employee whose primary duties involve maintaining law and order, protecting life and property, guarding against or inspecting for violations of law, or investigating persons other than persons who are suspected or convicted of [federal] offenses." 5 C.F.R. §§ 831.902, 842.802. In addition, the FERS regulation specifies that a "rigorous position," within the meaning of the statute, is "a position the duties of which are so rigorous that employment opportunities should, as soon as reasonably possible, be limited ... to young and physically vigorous individuals." 5 C.F.R. § 842.802.

## II

### A. *Bingaman*

As one of the parties to the MSPB case of *Peek v. Office of Personnel Management,*

No. DA–0831–93–0263–I–1 (Initial Decision July 15, 1993), Bingaman received LEO retirement credit under the CSRS for his services as a DSSA from February 28, 1989, through July 15, 1993. Bingaman subsequently filed a timely request for LEO credit for the period July 15, 1993, through July 13, 1994. The Department of the Treasury denied Bingaman's request for LEO credit for that period. On Bingaman's appeal, the Merit Systems Protection Board upheld the agency's decision.

The administrative judge in Bingaman's case was the same administrative judge who had ruled in Bingaman's favor on his request for LEO credit for the period from February 1989 to July 1993. With respect to his request for LEO credit for 1993–94, however, the administrative judge reached a contrary result and denied the request, even though Bingaman's duties had not materially changed. Explaining the different outcome, the administrative judge noted that in a series of recent decisions dealing with claims to LEO retirement credit, the Board has made it clear that "it is the character of 'frontline law enforcement work' entailing the unusual physical demands and hazards created by the direct contact of criminal investigations that establishes eligibility for law enforcement retirement coverage," not the extent to which a particular position contributes to a law enforcement mission.

Although the evidence showed that DSSAs such as Bingaman play an important role in the Customs Service's drug interdiction effort, the administrative judge found that Bingaman did not satisfy the Board's test for LEO eligibility. The administrative judge noted that Bingaman does not carry a weapon in the performance of his job, does not question or interview suspects, does not have personal contact with suspects, is not on call 24 hours a day, and has no direct participation in the apprehension of suspects. In sum, the administrative judge concluded that Bingaman's position "does not present unusual physical hazards due to frequent and/or direct contacts with criminals or suspected

criminals" and that his duties do not "place him in the frontline of law enforcement work, in that he has no interaction by direct contact with criminals or suspects." The administrative law judge therefore concluded that the evidence was insufficient to show that Bingaman performs the requisite duties of a "law enforcement officer," as that term is used in the statute and regulations governing LEO eligibility under the CSRS.

Bingaman did not seek review by the full Merit Systems Protection Board. The administrative judge's decision therefore became the final decision of the Board, from which Bingaman has sought this court's review.

### 1.

Bingaman asserts that his work leads directly to the apprehension and prosecution of suspects and that he is therefore entitled to LEO retirement credit. The administrative judge, he contends, improperly required that he have "frequent direct contact" with criminal suspects in order to qualify as a law enforcement officer. Pointing to the statutory and regulatory definition of "law enforcement officer," Bingaman argues that the "frequent direct contact" standard applies to employees who seek LEO credit based on their detention duties, but not to those employees seeking LEO credit because of the criminal investigation duties of their positions. *See* 5 U.S.C. § 8331(20) (referring to law enforcement officers engaged in "detention" as employees "whose duties in connection with individuals in detention suspected or convicted of [federal] offenses ... require frequent ... direct contact with these individuals"); 5 C.F.R. § 831.902 (defining "detention duties" as "duties that require frequent direct contact in the detention ... of individuals suspected or convicted of [federal] offenses").

■ While it is true that DSSAs play an important role in the Customs Service's drug interdiction program, the importance of a particular employee's contribution to a law enforcement mission is not enough to render

that employee a "law enforcement officer" within the meaning of the LEO retirement statutes. Because the early retirement program "is more costly to the government than more traditional retirement plans and often results in the retirement of important people at a time when they would otherwise have continued to work for a number of years," *Morgan v. Office of Personnel Management,* 773 F.2d 282, 286–87 (Fed.Cir.1985), the statutory term "law enforcement officer" has not been given expansive application. To the contrary, as this court has explained, the definition of law enforcement officer in section 8331(20) has been "strictly construed." *Ryan v. Merit Sys. Protection Bd.,* 779 F.2d 669, 672 (Fed.Cir.1985).

The LEO retirement credit statutes and the accompanying regulations provide only the most general guidance with respect to the intended scope of the term "law enforcement officer." The legislative history of the statutes, however, is somewhat more helpful. The Senate report on the 1974 legislation that created the general LEO retirement provision explained that the statute was intended to ensure that the covered positions "should be composed, insofar as possible, of young men and women physically capable of meeting the vigorous demands of occupations which are far more taxing physically than most in the Federal Service." S.Rep. No. 93–948, at 2 (1974), *reprinted in* 1974 U.S.C.C.A.N. 3698, 3699.

The Senate report on the subsequent legislation that created the LEO retirement provision for the FERS reiterated the point. The report stated that "law enforcement officer" was defined "to mean an employee with rigorous law enforcement duties that require young and vigorous individuals." S.Rep. No. 96–166, at 41 (1985), *reprinted in* 1986 U.S.C.C.A.N. 1405, 1446. The definitions of "firefighter" and "law enforcement officer," according to the report, were meant to "include only positions with duties requiring young and physically able employees," and were designed to "exclude other positions associated with firefighting and/or law enforcement which are not necessarily physical-

ly demanding." *Id.* at 6, *reprinted in* 1986 U.S.C.C.A.N. 1405, 1411. The report further stated that "[t]he limitations in the usage of [the definition of law enforcement officer] are similar to those for the firefighter definition," which the report stated would be limited to employees who "will actually and directly participate in firefighting activities." *Id.* at 40, *reprinted in* 1986 U.S.C.C.A.N. 1405, 1445. The mere fact of "frequent contact with criminals," the report added, "is an insufficient reason for a position to be defined as a law enforcement position." *Id.* at 41, *reprinted in* 1986 U.S.C.C.A.N. 1405, 1446. The reference to "frequent contact with criminals" indicates that such contact, standing alone, is not sufficient to qualify an employee as a "law enforcement officer," but it does not suggest, as Bingaman argues, that "frequent contact with criminals" should not be considered an important factor in determining whether an employee qualifies for LEO credit.

The Merit Systems Protection Board has extrapolated from the statutory and regulatory language, in light of the legislative history, to fashion the standard it has applied in this case and others. The Board has thus construed the statutory reference to persons engaged in the "investigation" and "apprehension" of persons suspected of committing federal crimes to be limited to those law enforcement personnel who are most immediately involved in the process of criminal investigation and arrest.

Without holding any single factor to be essential or dispositive, the Board has identified several considerations that bear on the question whether a particular employee qualifies as a "law enforcement officer" for purposes of entitlement to LEO retirement credit. According to the Board, a "law enforcement officer" within the statutory contemplation commonly (1) has frequent direct contact with criminal suspects; (2) is authorized to carry a firearm; (3) interrogates witnesses and suspects, giving *Miranda* warnings when appropriate; (4) works for long periods without a break; (5) is on call 24 hours a day; and (6) is required to main-

tain a level of physical fitness. *See Hobbs v. Office of Personnel Management,* 58 M.S.P.R. 628 (1993); *Sauser v. Office of Personnel Management,* 59 M.S.P.R. 489 (1993); *Peek v. Office of Personnel Management,* 63 M.S.P.R. 430 (1994), *aff'd,* 59 F.3d 181 (Fed. Cir.1995) (table); *Ferrier v. Office of Personnel Management,* 66 M.S.P.R. 241 (1995).

While the scope of the statutory category of "law enforcement officer" cannot be crisply defined with a single phrase, the set of factors the Board has developed captures the essence of what Congress intended. Applying those standards, the administrative judge properly found that Bingaman failed to establish that he is eligible for LEO retirement credit.

Bingaman points out that the pilots flying the airplanes investigating drug-smuggling activities receive LEO credit, but the DSSAs who perform their services in the same airplanes do not. Although the government notes that the pilots have somewhat different duties, it does not defend on the merits the award of LEO credit to pilots, but characterizes the credit given to pilots as attributable to the different role played by Customs Service pilots in drug interdiction programs in the past. In any event, the eligibility of pilots for LEO credit is not before us, and Bingaman is not entitled to LEO credit simply because pilots enjoy that status.

2

Bingaman next argues that the principle of collateral estoppel requires the government to accord him LEO credit, not only for the 1993–94 period, but for as long as his duties remain essentially the same. Noting that his duties have not changed materially since the date of the *Peek* decision, Bingaman argues that he should continue to receive LEO credit on the ground that the administrative law judge's favorable decision in the *Peek* case, which was not appealed, forecloses the government from seeking a contrary result in this case.

 The principle of collateral estoppel dictates that an issue that is fully and fairly

litigated, is determined by a final judgment, and is essential to that judgment, is conclusive in a subsequent action between the same parties. *See Restatement (Second) of Judgments* § 27 (1982). Bingaman notes that the decision in the original *Peek* case, to which he was a party, finally and validly determined that his work as a DSSA satisfied the eligibility requirements for LEO retirement credit. Accordingly, he argues, the government should not be permitted to relitigate that issue by contesting his eligibility for LEO credit without showing that his duties differ from those found to qualify for LEO credit in the *Peek* case.

■ Collateral estoppel is subject to exceptions when the circumstances dictate. *See Montana v. United States,* 440 U.S. 147, 162, 99 S.Ct. 970, 978, 59 L.Ed.2d 210 (1979). Courts have crafted an exception to the collateral estoppel principle when there has been a change in the applicable law between the time of the original decision and the subsequent litigation in which collateral estoppel is invoked. For example, the Supreme Court in *Commissioner v. Sunnen,* 333 U.S. 591, 599, 68 S.Ct. 715, 720, 92 L.Ed. 898 (1948), held collateral estoppel inapplicable where the governing legal principles changed following the initial decision that a taxpayer invoked to obtain tax benefits in later years. The Court explained that although a taxpayer "may secure a judicial determination of a particular tax matter [that] may recur without substantial variation for some years thereafter ... a change or development in the controlling legal principles may make that determination obsolete or erroneous, at least for future purposes." *Id.* at 599, 68 S.Ct. at 720. To perpetuate the initial ruling in subsequent tax years after a change in the governing legal principle accords the taxpayer involved in the initial litigation "a tax treatment different from that given to other taxpayers of the same class. As a result, there are inequalities in the administration of the revenue laws, discriminatory distinctions in tax liability, and a fertile basis for litigation confusion." *Id.; see also Limbach v. Hooven & Allison Co.,*

466 U.S. 353, 362–63, 104 S.Ct. 1837, 1843–44, 80 L.Ed.2d 356 (1984).

■ In this case, there was a significant change in the governing principles of law between the time of the original *Peek* decision and the time this case came before the Board. During the intervening period, the Board decided a number of cases, including a later decision in the *Peek* litigation and the leading decision of *Hobbs v. Office of Personnel Management,* 58 M.S.P.R. 628 (1993), in which the Board adopted essentially the same test for LEO eligibility as the administrative judge applied in this case. Those decisions signaled that the Board would take a narrow approach to the definition of "law enforcement officer" for the purpose of determining eligibility for LEO retirement credit.

Although the Office of Personnel Management did not appeal the initial decision in *Peek* to the full Board, the Board had occasion to comment on the administrative judge's decision in *Peek* when it addressed the motion for attorneys' fees filed by Bingaman and his co-appellants. Holding that the government's position in *Peek* was not unreasonable, the Board cited the *Hobbs* case and noted that "lack of direct contact with criminals or suspected criminals" is "an important factor" in the Board's LEO eligibility analysis. *Peek v. Office of Personnel Management,* 63 M.S.P.R. 430, 433 (1994). Implicitly criticizing the administrative judge's decision in the original *Peek* case, the Board explained that although the administrative judge had emphasized that the appellants' duties were integral to the enforcement of laws against drug smuggling, "it is not a position's efficacy or its contribution to a particular law enforcement mission which determines eligibility for preferential retirement credit, but rather its characteristic as 'frontline law enforcement work,' entailing unusual physical demands and hazards." *Id.* at 433–34.

From the Board's decisions in *Hobbs,* in the second *Peek* case, and in subsequent cases involving LEO retirement credit, it is

clear that the Board has adopted a legal interpretation of the statutory standard for LEO retirement credit that is significantly narrower than the standard applied by the administrative judge in the first *Peek* case. In a number of cases, this court and others have held that a significant change in the "legal atmosphere"—whether in the form of new legislation, a new court decision, or even a new administrative ruling—can justify a later court's refusal to give collateral estoppel effect to an earlier decision. *See Wilson v. Turnage,* 791 F.2d 151, 157 (Fed.Cir.1986); *CBN Corp. v. United States,* 176 Ct.Cl. 861, 364 F.2d 393, 396–400 (1966); *Graphic Communications Int'l Union, Local 554 v. Salem–Gravure Div. of World Color Press, Inc.,* 843 F.2d 1490, 1493 (D.C.Cir.1988); *Brock v. Williams Enters. of Georgia, Inc.,* 832 F.2d 567, 574 (11th Cir.1987); *Staten Island Rapid Transit Operating Auth. v. Interstate Commerce Comm'n,* 718 F.2d 533, 543 (2d Cir.1983). In light of the intervening Board decisions, we conclude that there has been a sufficient change in the "legal atmosphere" with respect to the issue of LEO retirement credit that the bar of collateral estoppel should not be applied in this case.

In support of his collateral estoppel argument, Bingaman cites the Supreme Court's decision in *United States v. Moser,* 266 U.S. 236, 45 S.Ct. 66, 69 L.Ed. 262 (1924). The Court in that case held that a retired naval officer who had obtained a judgment from the Court of Claims for retirement pay at a particular rate could defeat the government's effort to relitigate his eligibility for the retirement pay in a subsequent lawsuit. While that case is superficially similar to this one, *Moser* did not involve a change in the governing legal principles or the "legal atmosphere" with regard to the key legal issue between the first case and the second. *See Wilson v. Turnage,* 791 F.2d at 157. This case is therefore more like the subsequent Supreme Court decisions in *Commissioner v. Sunnen* and *Limbach v. Hooven & Allison Co.,* in which the Court held collateral estoppel inapplicable when there had been a significant change in decisional law between the

first case and the second. *See generally* 18 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice & Procedure* § 4425, at 253–54 (1981).

3

In a variant on his collateral estoppel argument, Bingaman contends that the Board was wrong to hold that he was required to submit annual requests for LEO credit after the first *Peek* decision. Instead, he argues, the *Peek* decision entitled him to receive LEO credit for as long as he remained in the same position, unless and until the agency could demonstrate that his duties were different from those he performed at the time of *Peek.*

In August 1993, shortly after the first *Peek* decision, OPM advised Bingaman by letter that as a result of the *Peek* case he would be granted LEO retirement credit from February 28, 1989, to the "date you cease to encumber this position." A few days later, OPM sent a revised version of the letter stating that Bingaman would be granted LEO retirement credit only through July 15, 1993, the date of the administrative judge's decision in *Peek.* The letter advised Bingaman that if he wanted continued LEO retirement credit in the future, he would have to make annual requests for that credit, beginning in July 1994, for as long as he remained in his position.

Bingaman's two co-appellants in the *Peek* case, who are not parties to this appeal, received similar letters. The two co-appellants filed a motion to enforce the initial decision, contending that the decision required that they be given LEO credit prospectively. The administrative judge denied that motion, holding that the pertinent OPM regulation, 5 C.F.R. § 831.906(e), required each of the appellants to make annual applications for LEO retirement credit covering the immediately preceding year. No appeal was taken from that order. Bingaman subsequently filed his request for LEO credit for July 1993 through July 1994, which was denied and which led to this appeal.

Bingaman argues that the administrative judge was wrong in declining to give his own decision in the original *Peek* case prospective effect. He contends that the regulation on which OPM and the administrative judge relied in so holding, 5 C.F.R. § 831.906(e), does not support the conclusion that the Board's ruling may be given only retrospective effect. To the contrary, he argues, the Board's decision in *Setevage v. Office of Personnel Management,* 31 M.S.P.R. 636 (1986), establishes that Board decisions on questions such as the one in this case are to be given full prospective effect.

■ It is unnecessary for us to decide whether section 831.906(e) limits the prospective effect of Board decisions, because that issue is not properly presented for review in this case. When OPM advised Bingaman that the *Peek* decision would not be given prospective effect, Bingaman could have protested OPM's decision by filing a motion to enforce the July 15, 1989, decision, as his two co-appellants did. Absent a showing of good cause and a request for an extension of time, such a motion was required to be filed within 30 days of Bingaman's receipt of the agency's notice of compliance with the *Peek* decision. *See* 5 C.F.R. § 1201.182(a). Instead of filing a motion to enforce the *Peek* decision, Bingaman followed the alternative course of filing annual requests for LEO retirement credit. Having elected that course, rather than filing a timely motion for enforcement, Bingaman cannot now in effect seek enforcement of the first *Peek* decision through an appeal from the administrative judge's ruling on his subsequent request for annual LEO credit. Because the question whether the initial *Peek* decision should have been given prospective effect is not before us, we uphold the decision of the Board denying LEO credit to Bingaman for the 1993–94 period.

## B. *Arps*

In the *Arps* case, the Board affirmed the agency's decision that 14 petitioners (collectively the Arps petitioners), who are covered by the FERS, failed to establish their entitlement to LEO credit. With the exception of petitioner Edmund Price, a Supervisory DSSA, the Arps petitioners are all DSSAs. Price contends that his duties "did not undergo a significant change" when his status changed from a DSSA to a Supervisory DSSA. Because Price does not argue that his Supervisory DSSA position gives him any better claim to LEO retirement credit than is enjoyed by the other Arps petitioners, our discussion applies equally to him and his 13 co-petitioners.

■ In this court, the Arps petitioners argue, as did Bingaman, that collateral estoppel based on the first *Peek* decision compels a reversal of the Board's decision in their case. We have already held that the first *Peek* decision may not be given collateral estoppel effect in Bingaman's case, and the same reasons apply to the Arps petitioners' collateral estoppel argument. In addition, none of the Arps petitioners were parties to the first *Peek* decision. Although collateral estoppel can be applied in some instances when the parties to the two proceedings in question differ, it is available against the government only when the parties to the two proceedings are the same. *See United States v. Mendoza,* 464 U.S. 154, 162, 104 S.Ct. 568, 573, 78 L.Ed.2d 379 (1984) (nonmutual offensive collateral estoppel does not apply against the government). Accordingly, even if Bingaman could invoke collateral estoppel in this case, the Arps petitioners could not.

On the merits, the Arps petitioners, like Bingaman, challenge the Board's decision that their DSSA positions do not qualify for LEO retirement credit. The administrative judge in their case noted that the evidence at the hearing before her established that the DSSAs prepared mission plans in advance of flights, directed the pilots on search patterns during the flights, and collected, recorded, and evaluated the evidence gathered with the on-board surveillance equipment. Upon identifying a suspect vessel or aircraft, the evidence showed, the DSSAs would establish its probable course and destination, track it

for extended periods of time, and then advise law enforcement personnel on the ground of its location.

After hearing a number of witnesses testify about the DSSAs' duties, the administrative judge concluded that the petitioners "search for, identify, and *assist* in 'catching' drug smugglers," but they "have no *direct* face to face contact with the criminals or suspected criminals and do not participate in ground apprehensions. Moreover, it is undisputed that they do not carry weapons, or give Miranda warnings, nor. are they required to maintain a particular level of physical fitness." While acknowledging that DSSAs have played "an integral part in the success of the agency's mission to thwart drug smugglers," the administrative judge concluded that the evidence failed to show that the petitioners' duties "are primarily the investigation, apprehension, or detention of individuals suspected or convicted of [federal] offenses." In addition, finding that the DSSAs' duties do not involve "frontline law enforcement work" entailing unusual physical demands and hazards, the administrative judge concluded that the duties of the position of DSSA "are not sufficiently rigorous that employment opportunities should be limited to young and physically vigorous individuals."

The Arps petitioners contend that the administrative judge improperly limited her consideration to the DSSA position description, as dictated by 5 C.F.R. § 842.804(a). That regulation, the Arps petitioners argue, is invalid for the same reasons that this court in *Little v. Office of Personnel Management,* 762 F.2d 962 (Fed.Cir.1985), held a similar regulation under the CSRS to be invalid. We find it unnecessary to decide whether section 842.804(a) is invalid in light of *Little* and earlier cases cited therein, because in deciding this case the administrative judge took into consideration not only the DSSA position description, but also testimony from numerous witnesses regarding the actual duties performed by the petitioners. The petitioners have not pointed to any pertinent item of evidence that the administra-

tive judge refused to consider in reaching her decision, nor do they quarrel with her description of their duties; they simply disagree with the legal standard that she applied and the conclusion to which that standard led her.

As in Bingaman's case, we disagree with the petitioners that the administrative judge used the wrong legal standard to determine the petitioners' eligibility for LEO credit. Like the administrative judge in *Bingaman,* the administrative judge in *Arps* properly declined to extend LEO coverage based on the importance of a particular employee's role in the criminal investigative process, but instead focused on whether the employee's duties were of the physically demanding sort that Congress had in mind when it enacted the LEO retirement statute for FERS employees.

The Arps petitioners also take issue with the administrative judge's finding that the DSSA position is not a rigorous one, *i.e.,* that it is not a position limited to "young and physically vigorous individuals" pursuant to 5 U.S.C. § 8401(17)(A)(ii). The petitioners claim that the DSSA position meets the requirements of section 8401(17) because it exposes them to a variety of potential dangers and sometimes requires long working hours. We disagree. The administrative judge assessed the testimony about the rigors and stress associated with the DSSA position and concluded that the position is not so rigorous that it involves duties that only young and physically vigorous persons can perform. The evidence showed that DSSAs are not required to meet any age or fitness requirements, and the administrative judge found that they spend as long as 20 hours airborne only "on occasion." The Board's decision on that issue was therefore supported by substantial evidence.

### C. *Adair*

In the *Adair* case, the Board found that nine employees (collectively the Adair petitioners), who are covered by the FERS, failed to establish that they were entitled to

have the Board order the Department of the Treasury to grant them LEO credit. The Board noted that an employee covered by the FERS who wishes to request LEO credit and preserve the LEO credit claim for review by the Board must make a timely request to his agency pursuant to 5 C.F.R. § 842.804(c).

Section 842.804(c) provides that an employee who is in a position that has not been designated for LEO credit must, "within 6 months after entering the position or after any significant change in the position, formally and in writing seek a determination from the employing agency" that the position is subject to the higher withholding rate applicable to law enforcement officers. If the employee does not do so, the agency's determination that the position is not entitled to LEO credit will be presumed to be correct. That presumption can be rebutted, the regulation provides, if the employee shows "by a preponderance of the evidence that the employee was unaware of his or her status or was prevented by cause beyond his or her control from requesting that the official status be changed at the time the service was performed." 5 C.F.R. § 842.804(c). The agency's decision denying an individual's request for approval of a position as entitled to LEO credit may be appealed to the MSPB. *See* 5 C.F.R. § 842.807(a). The effect of those two regulatory provisions is that if the employee does not request LEO credit within the six-month period specified in section 842.804(c) or show good cause for the failure to do so, the agency's determination will be deemed conclusive and the MSPB will not review the merits of that determination.

The Adair petitioners argued to the Board that a December 6, 1990, memorandum from petitioner Price, a Supervisory DSSA, satisfied the formal written request requirement of the six-month rule. The December 6, 1990, memorandum did not identify any specific employees, but rather referenced an August 15, 1989, memorandum signed by 40 individuals. The Board noted that none of the nine Adair petitioners had signed the August 15 memorandum. In fact, the Board

observed, none of the nine Adair petitioners even occupied DSSA positions on August 15, 1989. Concluding that the petitioners had failed to comply with section 842.804(c), the Board dismissed their appeals.

■ In this court, the Adair petitioners assert that a timely request complying with the six-month rule "was made on their behalf," apparently referring to the December 6, 1990, memorandum, which in turn referred to the August 15, 1989, memorandum. The petitioners also contend that "the Agency has been aware for years" that all of the LEO credit requests made after 1989 covered any petitioner "who did not sign the August 1989 letter."

We agree with the Board that the petitioners failed to comply with the notification requirement of 5 C.F.R. § 842.804(c). The regulation requires employees to seek LEO credit through a formal, written request; it does not permit them to satisfy that requirement either by proxy or by reliance on the agency's alleged awareness that all members of a particular group of employees would like to be accorded LEO credit. The Board therefore correctly concluded that under the terms of section 842.804(c) the petitioners failed to rebut the presumption that the agency's decision was correct.

■ One of the Adair petitioners, Wendell Ruegsegger, was not employed as a DSSA at the time of the December 6, 1990, memorandum, but he argues that a December 23, 1992, letter by W. Craig James, a lawyer, constituted the formal, written request required by section 842.804(c). As the government notes, however, the James letter did not identify any specific employees, nor did it specifically request LEO credit or represent that Ruegsegger had retained James in an effort to obtain LEO credit. Instead, the James letter merely followed up on a previous request for LEO credit. We therefore agree with the Board that Ruegsegger failed to submit the formal written request required by section 842.804(c).

■ All of the Adair petitioners argue that, if the various communications with the

agency by DSSAs and their representatives between 1985 and 1992 did not satisfy the notification requirement of section 842.804(c), the principle of equitable estoppel should preclude the application of that regulation against them. They contend that from as early as 1985 the agency was aware that all of the DSSAs wanted LEO retirement credit, and that the agency therefore had a duty to advise each of them on how to obtain LEO credit. Because the agency failed to do so, and because the agency was unresponsive to their efforts to obtain a decision on the issue of LEO credit, they argue that the agency may not now rely on the formal requirements of section 842.804(c) to avoid addressing their claims on the merits.

The petitioners' arguments are unavailing. While the agency may have been less responsive to the inquiries concerning LEO credit than it should have been, the petitioners have not pointed to any acts of deceit or malfeasance by the agency that would justify invoking equitable estoppel in this case. In particular, the agency had no affirmative duty to advise the petitioners on how to go about requesting LEO credit, and there was therefore no breach of duty on which a claim of equitable estoppel can be based.

The petitioners contend that the agency provided information about LEO credit to other employees, but did not provide information to the DSSAs about how to request such credit, and that the differing treatment given to the DSSAs supports their estoppel argument. We find no impropriety in the agency's providing information about LEO eligibility to those employees it deemed entitled to LEO retirement credit, but not to employees the agency has always regarded as ineligible. The petitioners have thus failed to establish that equitable estoppel entitles them to a waiver of the requirements of section 842.804(c).

To be sure, the six-month rule of section 842.804(c) does not apply if an employee proves that he was unaware of his status or that some cause beyond his control prevented him from making a request. *See* 5 C.F.R.

§ 842.804(c). The petitioners, however, do not contend that the six-month rule is inapplicable for either of those reasons. We therefore agree with the Board that the Adair petitioners failed to file timely requests for reclassification with the agency and thus did not preserve their right to obtain MSPB review of the Treasury Department's denial of LEO retirement credit for DSSA employees.

Finally, petitioner Edmond Smith, a Supervisory DSSA, also sought LEO credit for his service, both as a DSSA and as a Supervisory DSSA. The Board found that Smith's promotion to the position of Supervisory DSSA constituted a "significant change in position" and that he failed to comply with 5 C.F.R. § 842.804(c) by making a request for LEO credit after he was promoted from DSSA to Supervisory DSSA. The Board therefore limited its ruling in Smith's case to the period that he served as a DSSA.

In this court, Smith insists that his promotion to the position of Supervisory DSSA did not entail a "significant change in position," and that the Board erred in limiting its consideration of his claim to the period that he served as a DSSA. We find it unnecessary to determine whether Smith's promotion to the position of Supervisory DSSA constituted a "significant change in position." The Board ruled that Smith was not entitled to LEO retirement credit for his work as a DSSA, and we have upheld that determination. Smith does not contend that his work as a Supervisory DSSA involved different responsibilities that gave him a stronger basis for claiming entitlement to LEO credit; in fact, his entire argument on this point is that his promotion to Supervisory DSSA did not entail a significant change in his duties. Accordingly, even if the Board had addressed the period of Smith's service as a Supervisory DSSA, it would not have reached a different result in his case.

### D. *Kern*

Petitioner Eldon Kern is a Supervisory DSSA who is covered by the CSRS. Kern

was one of the employees who signed the August 15, 1989, memorandum requesting that the DSSA position be considered for LEO retirement credit. At that time, however, Kern had already become a Supervisory DSSA, and the memorandum did not request that the Supervisory DSSA position be considered for LEO credit. Kern argued that the August 15, 1989, memorandum was sufficient to put the agency on notice that he wanted LEO credit for his Supervisory DSSA position, even though the memorandum referred only to the DSSA position. The Board, however, held that Kern had never encumbered the position that was the subject of the August 15, 1989, memorandum and that the memorandum therefore was not effective as a request for LEO credit for his position.

Kern asks us to hold that the August 15, 1989, memorandum was sufficient to constitute a request for LEO credit on his behalf. He contends that the memorandum should not be construed as limited to DSSAs, but instead should be construed to extend to Supervisory DSSAs such as himself.

It may well be that by adding his name to the list of those signing the August 15, 1989, memorandum Kern intended to seek LEO credit for his own position and not merely to support the efforts of the DSSAs to obtain LEO credit for themselves. Nonetheless, the memorandum does not request consideration of LEO credit for any position but the DSSA position, and the ultimate OPM ruling in response to that request addressed only the DSSA position. The administrative judge was therefore correct to hold that the August 15, 1989, memorandum did not request LEO credit for any employee in Kern's position.

Although Kern contends that it was a grave injustice for the Board to dismiss his case on the procedural ground urged by the government, Kern does not suggest that the merits of his underlying claim to LEO credit differ in any material way from the claims raised by Bingaman or, in the FERS context, by the Arps petitioners. Those co-appel-lants, represented by the same counsel, lost on the merits of their claims. For the same reasons that applied in their cases, it seems inescapable that Kern would have lost on the merits of his claim even if the administrative judge had ruled in his favor on the procedural issue. Accordingly, this is not a case in which a procedural defect has been invoked to deprive an employee of benefits to which he otherwise would have been entitled. For that reason, even if we regarded the Board's procedural ruling in Kern's case as flawed, we would treat the error as harmless. We therefore uphold the Board's determination that Kern failed to satisfy the procedural prerequisite to review of the merits of his claim to LEO credit.

Each party shall bear its own costs for this appeal.

*AFFIRMED.*