**James T. HANNON, Petitioner,**

v.

**DEPARTMENT OF JUSTICE,**
**Respondent.**

No. 99–3354.

United States Court of Appeals,
Federal Circuit.

DECIDED: Dec. 7, 2000.

Michael J. Kator, Kator, Scott & Parks, P.L.L.C., of Washington, DC, argued for

* Judge Plager assumed senior status on November 30, 2000.

petitioner. With him on the brief were Irving Kator, and Cathy Harris.

Scott D. Austin, Trial Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for respondent. With him on the brief were David W. Ogden, Assistant Attorney General; David M. Cohen, Director; and James M. Kinsella, Deputy Director. Of counsel was James E. Hicks, Attorney, Office of Chief Counsel, Administrative Law Section, Drug Enforcement Administration, of Washington, DC.

Before LINN, Circuit Judge, FRIEDMAN and PLAGER*, Senior Circuit Judges.

FRIEDMAN, Senior Circuit Judge.

This petition for review challenges the decision of the Merit Systems Protection Board ("Board"), sustaining the agency's determination that the petitioner was not a law enforcement officer and therefore was not entitled to enhanced retirement benefits under 5 U.S.C. § 8331(20). We affirm.

I

Federal law enforcement personnel may retire under the Civil Service Retirement System at age fifty with enhanced benefits after "completing 20 years of service as a law enforcement officer." 5 U.S.C. § 8336(c). The basic facts relating to Hannon's service, as set forth in the Board's decision and the record, are largely undisputed.

Hannon was employed as a diversion investigator in the Drug Enforcement Administration ("agency") between 1972 and 1979, and as a supervisory and administrative diversion investigator from 1979 forward. As the job title suggests, a diversion investigator investigates the diversion of controlled substances from legitimate distribution channels to illegal ones. He inspects and audits manufacturers and distributors of such substances to assure that

their products have not been so diverted. The work includes determining compliance with record keeping procedures, security safeguards, and other requirements of the Controlled Substance Act. 21 U.S.C. §§ 801–904.

Diversion investigators also participate in criminal investigations. Under agency policy, however, they cannot carry firearms, make arrests, execute search warrants, make undercover purchases, control confidential informants, or conduct moving surveillance. The latter functions are performed by the agency's special agents.

Hannon applied to the agency for enhanced retirement credit as a law enforcement officer. After the agency denied the application, Hannon appealed to the Board.

In his initial decision, the Board's administrative judge concluded that Hannon had been a law enforcement officer. *Hannon v. Dep't of Justice*, 82 M.S.P.R. 315 (1999). The administrative judge stated that Hannon "testified in great detail [that] he conducted surveillances of suspect doctors' and pharmacists' places of business; interviewed patients and customers of the suspects and the suspects themselves, giving Miranda warnings when necessary; attempted consensual telephone calls between a cooperating individual and a suspect to obtain incriminating evidence; obtained and executed administrative inspection warrants; served as an affiant to obtain search warrants and then participated in searches; analyzed records as possible evidence; carried out controlled deliveries of marked drug shipments; issued administrative subpoenas for telephone records and obtained judicial subpoenas for handwriting exemplars; monitored and recorded undercover buys from nearby cars; and testified before grand juries and at trials in federal and state courts." He noted that Hannon's supervisor and Illinois State Police Sergeant Rodek, who worked with Hannon on some criminal cases, both confirmed that he did that work. The administrative

judge concluded that Hannon's activities "show that he was involved in criminal investigations," even though he was prohibited from "carrying weapons, making undercover purchases, controlling and paying confidential informants, making arrests and executing search warrants, and conducting surveillances," and "was not on call 24 hours a day, and that he did not work extensive amounts of overtime."

The Board reversed. *Hannon v. Dep't of Justice*, 82 M.S.P.R. 315 (1999). After analyzing Hannon's duties in light of the standards articulated in our decision in *Bingaman v. Department of the Treasury*, 127 F.3d 1431, 1436 (Fed.Cir.1997), which we decided after the initial decision in this case and which we discuss below, the Board concluded:

> Although the evidence shows that the appellant spent a majority of his time during the 1972 and 1978 period in support of criminal investigations, we find, based on consideration of all the relevant factors, that the appellant's primary duties as a Diversion Investigator did not constitute the " 'frontline law enforcement work,' entailing unusual physical demands and hazards," that is required for primary LEO service credit. The primary factor supporting such coverage was his work interviewing witnesses and suspects, sometimes in locations that were potentially hazardous. But he did not carry a firearm, did not have the authority to make arrests or execute search warrants, was not on call 24 hours a day, and was not required to maintain a significant level of physical fitness. [Citation omitted.]

## II

A. A "law enforcement officer" is defined in 5 U.S.C. § 8331(20) as

> an employee, the duties of whose position are primarily the investigation, apprehension, or detention of individuals suspected or convicted of offenses against the criminal laws of the United

States, including an employee engaged in this activity who is transferred to a supervisory or administrative position.

■ We strictly construe the definition of law enforcement officer. *Bingaman,* 127 F.3d at 1435 (quoting *Ryan v. Merit Sys. Prot. Bd.,* 779 F.2d 669, 672 (Fed.Cir. 1985)).

In *Bingaman,* we described the six factors that the Board had developed to determine whether a particular employee qualified as a law enforcement officer as "captur[ing] the essence of what Congress intended." *Id.* at 1436. Thus, a law enforcement officer "commonly (1) has frequent direct contact with criminal suspects; (2) is authorized to carry a firearm; (3) interrogates witnesses and suspects, giving *Miranda* warnings when appropriate; (4) works for long periods without a break; (5) is on call 24 hours a day; and (6) is required to maintain a level of physical fitness." *Id.* (citations omitted). No single factor, however, is "essential or dispositive." *Id.*

The Board has placed the further gloss on the definition of law enforcement officer that the critical factor in determining whether a particular position so qualifies is whether it involves " 'frontline law enforcement work,' entailing unusual physical demands and hazards." *Peek v. Office of Pers. Mgmt.,* 63 M.S.P.R. 430, 433–34 (1994), *aff'd,* 59 F.3d 181 (Fed.Cir.1995) (table).

B. Four of the six indicia of law enforcement officer status specified in *Bingaman* are not present here. Hannon concedingly was not authorized to and did not carry a firearm and was not on call twenty-four hours a day. The Board found that two other indicia—being required to maintain a level of physical fitness and frequent direct contact with criminal suspects—were not met. It stated that even if the agency's physical standards for diversion investigators were applicable here (which the government denies), those standards

were not particularly rigorous. They specified, inter alia, that DI's must: have vision correctable to not less than $^{20}/_{40}$ in at least one eye; be able to hear conversational speech at twenty feet; have "distinct speech and free breathing"; lift and carry cartons of records and containers of controlled substances; do extensive walking and standing; and do moderate lifting and carrying. These descriptions are consistent with the appellant's testimony. He described "sometimes spending a lot of time running around in a warehouse, moving boxes, moving drums around to try and get accurate counts," and "[s]tanding on your feet for long periods of time going through the inventory process.... To me, that's fairly rigorous." We disagree. These activities do not bespeak being required to maintain a significant level of physical fitness, especially when compared to circumstances cited by the Board when finding LEO status. *Cf. Bremby,* slip op. ¶ 20 (citing testimony that Police Officers had been removed for physical inability to pursue or grapple with a suspect, and that officers must have the capability to run, walk, and climb over rough and unfamiliar terrain, fences and other obstacles for extended periods of time); *Ferrier,* 66 M.S.P.R. at 245 (incumbents had to pass a five-event Physical Fitness Battery). [Record citations omitted.]

■ The Board also found that Hannon's "job activities did not include frequent direct contact with criminal suspects." Substantial evidence—much of it Hannon's own testimony—supports that finding. The Board cited (1) agency guidelines that permitted Hannon to conduct only stationary surveillance, which Hannon testified "involved basically stationing myself with another investigator across the street [from a pharmacy or doctor's office] and watching who came and went"; (2) Hannon's description of his work to arrange telephone calls between cooperating individuals and a suspect,

which merely involved "asking [the cooperating individual] to call . . . the doctor and place an order [for drugs.]"; (3) Hannon's statement that he obtained and executed administrative subpoenas and inspection warrants but almost never executed a judicial search warrant; (4) Hannon's testimony "that he was present at the execution of only a dozen or so searches, and four or five arrests, during his entire career"; (5) Hannon's statement that he watched when controlled deliveries of marked drug shipments were made but did not deliver any himself; and (6) Hannon's testimony that he merely monitored undercover purchases by waiting in a car with a special agent, who was authorized to carry a gun, while another special agent made the purchase.

In considering whether Hannon worked for long periods without a break, another *Bingaman* indicium, the Board acknowledged the testimony that Hannon worked three or four hours overtime each week and "worked long stretches without a break" but concluded, in light of the lack of a vigorous physical standard and unusual hazards, that Hannon's work activities did not involve rigorous working conditions.

The Board ruled that the record showed the presence of the remaining *Bingaman* indicia: "We conclude that a significant portion of the appellant's time spent interviewing witnesses and suspects was consistent with law enforcement work, and that some of this work held a significant potential for hazard."

After evaluating Hannon's duties under the *Bingaman* factors, the Board concluded:

> Although the evidence shows that the appellant spent a majority of his time during the 1972 and 1978 period in support of criminal investigations, we find, based on consideration of all the relevant factors, that the appellant's primary duties as a Diversion Investigator did not constitute the " 'frontline law enforcement work,' entailing unusual physical demands and hazards," that is required for primary LEO service credit. The primary factor supporting such coverage was his work interviewing witnesses and suspects, sometimes in locations that were potentially hazardous. But he did not carry a firearm, did not have the authority to make arrests or execute search warrants, was not on call 24 hours a day, and was not required to maintain a significant level of physical fitness. [Citation omitted.]

Hannon contends that the Board improperly gave insufficient weight to those of his activities it found to support law enforcement officer status and failed to give proper weight to other evidence supporting that conclusion. For example, he asserts that although the Board found that he interviewed witnesses and suspects, it erred in not finding that he had frequent direct contact with criminal suspects.

■ The determination of factual issues and the drawing of appropriate inferences from them is for the Board, not for this reviewing court. We cannot say that the Board's findings, upon which it based its determination that Hannon was not a law enforcement officer, are not supported by substantial evidence.

C. We next consider whether the Board's determination that Hannon was not a law enforcement officer was arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with the law. *See* 5 U.S.C. § 7703(c).

Hannon argues that the Board misapplied the *Bingaman* factors. It was the Board, not this court, that developed those factors. 127 F.3d at 1436 (citing *Hobbs v. Office of Pers. Mgmt.*, 58 M.S.P.R. 628 (1993); *Sauser v. Office of Pers. Mgmt.*, 59 M.S.P.R. 489 (1993); *Peek v. Office of Pers. Mgmt.*, 63 M.S.P.R. 430 (1994), *aff'd*, 59 F.3d 181 (Fed.Cir.1995) (table); *Ferrier v. Office of Pers. Mgmt.*, 66 M.S.P.R. 241 (1995)). In *Bingaman*, we merely recognized and applied the factors the Board

had adopted as "captur[ing] the essence of what Congress intended". *Id.*

In *Peek,* one of the cases in which the Board developed the *Bingaman* factors, the Board stated that "eligibility for preferential retirement credit [as a law enforcement officer is determined by the position's] character as 'frontline law enforcement work,' entailing unusual physical demands and hazards." 63 M.S.P.R. at 433–34. In the present case, the Board properly followed and applied that principle in concluding that the administrative judge "correctly addressed the existence and degree of hazard associated with the appellant's duties as one of many factors that was entitled to consideration."

■ Hannon argues that the Board erred in even considering work hazard in concluding that he was not a law enforcement officer. The Board consistently has recognized, however, that hazard is a significant element of law enforcement work. *See, e.g., Ferrier,* 66 M.S.P.R. at 244 (distinguishing "criminal investigation from non-criminal investigation include[s the factor of] unusual physical hazards for the investigator arising from frequent contacts with criminals and suspected criminals"); *Peek,* 63 M.S.P.R. at 434 (determining "eligibility for preferential retirement credit [depends on whether a position] entail[s] unusual physical demands and hazards"); and *Sauser,* 59 M.S.P.R. at 492 ("determining whether an employee's duties primarily involved criminal investigations [included considering] whether the employee's work involved unusual physical hazards"). That is a permissible gloss on the statutory language.

Hannon contends, however, that the legislative history indicates that work hazard is not an appropriate factor for the Board to consider in determining law enforcement officer status. The 1948 statute providing more favorable retirement for law enforcement officers generally, stated that, in evaluating applications for early retirement, the Civil Service Commission "shall give full consideration to the degree of hazard to which such officer or employee is subjected in the performance of his duties." Act of July 2, 1948, ch. 807, 62 Stat. 1221. The same provision also required an employee seeking such early retirement first to request law enforcement status from either the Civil Service Commission or, as authorized by a later statute, from the head of his or her agency.

In 1974, Public Law No. 93–350, 88 Stat. 355 (codified in 5 U.S.C. § 8331(20)), deleted the language requiring the consideration of hazard. At the same time, it also deleted the requirement that an employee seeking early retirement must first obtain prior recognition of his law enforcement officer status from the Civil Service Commission or the agency head.

The deletion of the requirement that the Civil Service Commission or the agency head must "give full consideration to" the hazard element does not establish, as Hannon argues, that the Board (the Commission's successor) was thereby precluded from even considering that factor. Indeed, the legislative history of the 1974 statute and a later statute that created the law enforcement officer requirement under the Federal Employee Retirement System—history that this court in *Bingaman* quoted from and relied upon—is consistent with the conclusion that hazard is an important aspect of a law enforcement officer's work. As *Bingaman* stated, the Senate Committee Report

stated that "law enforcement officer" was defined "to mean an employee with rigorous law enforcement duties that require young and vigorous individuals." S.Rep. No. 96–166, at 41 (1985), *reprinted in* 1986 U.S.C.C.A.N. 1405, 1446. The definitions of "firefighter" and "law enforcement officer," according to the report, were meant to "include only positions with duties requiring young and physically able employees," and were designed to "exclude other positions asso-

ciated with firefighting and/or law enforcement which are not necessarily physically demanding." *Id.* at 6, *reprinted in* 1986 U.S.C.C.A.N. 1405, 1411. 127 F.3d at 1435–36. The 1974 Committee Report also noted that the reason for this change was to delete the requirement that, before obtaining early retirement, the employee must first obtain a ruling on law enforcement officer status, because that requirement had dissuaded some law enforcement officers from seeking early retirement. S.Rep. No. 93–948, at 2 (1974), *reprinted in* 1974 U.S.C.C.A.N. 3698, 3699.

Nothing in this history shows, or even suggests, that Congress intended to prohibit consideration of hazard in determining law enforcement officer status.

Hannon further contends that the Board misapplied the *Bingaman* factors by engrafting onto them the additional requirements that the employee had suffered "actual harm" or "unusual hazard" or that his life had been threatened. The argument is based upon passing comments in the Board's opinion, which cannot properly be read as imposing those requirements as elements of law enforcement status.

■ D. In his reply brief, Hannon for the first time argues that the language of 5 U.S.C. § 8331(20), defining "law enforcement officer" as someone whose duties "are primarily the investigation, apprehension, or detention of individuals suspected or convicted" of federal criminal offenses, is clear on its face. He asserts that his work met that standard and that the "new standards" the Board has "engraft[ed]" for determining that status are therefore unauthorized. This argument, not made in Hannon's lengthy opening brief and to which the government had no opportunity to respond, comes too late. *See Becton Dickinson & Co. v. C.R. Bard, Inc.*, 922 F.2d 792, 800 (Fed.Cir.1990) ("[A]n issue not raised by an appellant in its opening brief ... is waived.").

■ E. Hannon's arguments basically adopt and follow the administrative judge's theory that Hannon was a law enforcement officer because "he was involved in criminal investigations." That is not the standard, however, that the Board applies in determining the question. Something more is required before the employee can be said to have engaged in the " 'frontline law enforcement work,' entailing unusual physical demands and hazards" that is necessary for "a particular position" to "qualif[y]" as a "law enforcement officer" under 5 U.S.C. § 8331(20).

In *Bingaman*, there were none of the indicia of law enforcement officers status. The employees claiming that status conduct surveillance from aircraft and "identify particular aircraft or boats as likely smuggling vessels and relay their findings to ground crews that apprehend the suspected smugglers. The [employees] do not conduct the apprehension of the suspected smugglers on the ground and do not have direct personal contact with suspects." 127 F.3d at 1433. This court upheld the Board's determination that none of the employees had established their entitlement to law enforcement officer retirement credit.

Other cases in which the Board held that the employees' work did not establish that status similarly involved less indicia than the present case. For example, in *Tyrrell v. Department of Veterans Affairs*, 83 M.S.P.R. 493 (1999), the Board ruled that hospital police officers, whose primary duties involve providing security and insuring compliance with traffic and parking procedures at a hospital, were not law enforcement officers because they did not have frequent direct contact with criminal suspects although there was some potential for danger. Similarly, in *Hobbs*, the Board ruled that an Alcohol, Tobacco and Firearms special inspector was not entitled to law enforcement credit because the inspector "was not required to maintain a level of physical fitness, work overtime frequently, be on call 24 hours a day, carry a weapon or maintain proficiency in the use of a weapon, or give *Miranda* warn-

ings to the witnesses whom he interviewed in the course of his investigations. Nor did he generally have contacts with suspected or known criminals." 58 M.S.P.R. at 633 n. 5 (1993).

In contrast, cases in which the Board held that law enforcement officer status had been established involved greater indicia of such status than Hannon's work. Thus, in *Ferrier*, a Fish and Wildlife police officer who arrested suspects and whose experience included a "high-speed car chase through a residential area [which ended when the officer] pursued [the suspect] over a ten-foot wall before apprehending and arresting him" was a law enforcement officer. 66 M.S.P.R. at 246; *see also Bremby v. Dep't of the Navy*, 81 M.S.P.R. 450, 457 (1999) (Naval base police had "frequent contact with criminal suspects," regularly were required to report for duty at all hours, and were required to maintain a level of physical fitness); *Taylor v. Dep't of the Treasury*, 68 M.S.P.R. 693 (1995) (an explosives enforcement officer investigated crime scenes, collected evidence, interviewed witnesses and suspects, prepared and executed search warrants, rendered explosive and incendiary devices safe, and carried a weapon); *Sauser*, 59 M.S.P.R. at 494 (a customs inspector and customs patrol officer "frequently pursued and helped apprehend suspected criminals in situations involving great danger to himself[,] has completed advanced tactical firearms instruction, . . . and [was] a member of a high-risk Warrant Entry Tactical Team involving the use of special weapons and tactics").

Hannon's work fell somewhere between activities that had been held to be law enforcement officer work and those that had been held not to be so. As noted, two of the indicia of that status concedingly are absent. The Board found that another two—maintaining a level of physical fitness and frequent direct contact with criminal suspects—had not been shown. With respect to the two other criteria, the Board found that one had been met and stated that, although Hannon had testified that he had worked long hours without a break (the remaining factor), his work did not involve vigorous working conditions. Looking at the totality of the evidence— and no single factor is "essential or dispositive," *Bingaman*, 127 F.3d at 1436—the Board concluded that Hannon's "primary duties as a Diversion Investigator did not constitute 'the "frontline law enforcement work," entailing unusual physical demands and hazards,' that is required for [law enforcement officer] service credit."

■ The evaluation of and weight to be given to the various *Bingaman* factors and the other evidence in the record are judgment calls that rest primarily within the discretion of the Board. Here the Board, "based on consideration of all the relevant factors," concluded that Hannon had not established law enforcement officer status. Since the Board considered the relevant factors, it is not our function to substitute our judgment for that of the agency regarding the weight to be given them. That is a task for the Board, not the reviewing court. *Cf. Sec'y of Agric. v. Cent. Roig Ref. Co.*, 338 U.S. 604, 70 S.Ct. 403, 94 L.Ed. 381 (1950) (Secretary complied with Sugar Act of 1948 requirement that, in allotting sugar quotas, he "tak[e] into consideration" three factors when, after considering them, he concluded that one of them "could not fairly be applied" and "g[a]ve no weight to this factor." *Id.* at 608–09, 70 S.Ct. 403. "The Secretary may conclude, after due consideration, that in the particular situation before him it is not essential that each of the three factors be quantitatively reflected in the final allotment formula." *Id.* at 613, 70 S.Ct. 403).

■ We review the Board's ultimate determination whether a particular employee is a law enforcement officer under 5 U.S.C. § 8331(20) under an arbitrary and capricious standard. *See* 5 U.S.C. § 7703(c); *Morgan v. Office of Pers. Mgmt.*, 773 F.2d 282, 285 (1985). We cannot say that, considering all the circumstances, the Board's

decision that Hannon was not a law enforcement officer was arbitrary and capricious.

## CONCLUSION

The decision of the Merit Systems Protection Board denying Hannon law enforcement officer credit is

*AFFIRMED.*