# United States Court of Appeals for the Federal Circuit

04-5034

JOHN D. CROWLEY,

Plaintiff-Appellee,

v.

UNITED STATES,

Defendant-Appellant.

Cathy A. Harris, Kator, Parks & Weiser, P.L.L.C., of Washington, DC, argued for plaintiff-appellee. With her on the brief were Irving Kator and Michael J. Kator.

Scott D. Austin, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellant. With him on the brief were Peter D. Keisler, Assistant Attorney General, David M. Cohen, Director, and James M. Kinsella, Deputy Director. Of counsel on the brief was James E. Hicks, Office of Chief Counsel, Drug Enforcement Administration, of Washington, DC.

Appealed from: United States Court of Federal Claims

Judge Marian Blank Horn

# United States Court of Appeals for the Federal Circuit

04-5034

JOHN D. CROWLEY,

Plaintiff-Appellee,

v.

UNITED STATES,

Defendant-Appellant.

_____

DECIDED: February 17, 2005

_____

Before CLEVENGER, DYK, and PROST, <u>Circuit Judges</u>.

Opinion for the court filed by <u>Circuit Judge</u> PROST.  Concurring opinion filed by <u>Circuit Judge</u> DYK.

PROST, <u>Circuit Judge</u>.

The United States appeals the United States Court of Federal Claims' assertion of jurisdiction in this case, its grant of law enforcement officer ("LEO") status to the appellee, John D. Crowley, its holding that the appellee was not required to exhaust his administrative remedies, and its legal conclusion that the appellee is entitled to supplemental pay and pre-judgment interest stemming from his claim under the Federal Law Enforcement Pay Reform Act of 1990, Pub. L. No. 101-509, §§ 401-

412, 104 Stat. 1389, 1465-69 ("FLEPRA").[1] We affirm the Court of Federal Claims'

assertion of jurisdiction in this case. We reverse its holding regarding Mr. Crowley's

LEO status and decline to reach the issues of exhaustion and pre-judgment interest.

## BACKGROUND

The FLEPRA promises law enforcement officers supplemental pay over and

above their standard pay if they work in certain metropolitan areas. 5 U.S.C. § 5305

note (2000). The statutory definition of "law enforcement officer" that the FLEPRA relies

on is included in the retirement statutes dealing with LEOs in the Civil Service Reform

Act of 1978 ("CSRA").[2] By the terms of the FLEPRA, a federal employee must satisfy

the statutory definition of a "law enforcement officer" found in 5 U.S.C. § 8331(20) to

qualify for the pay supplement. See 5 U.S.C. § 5541(3)(A) (2000). To meet the

statutory definition of a LEO found in § 8331(20), a federal employee must either work

in a primary law enforcement position (i.e. dedicated "primarily [to] the investigation,

apprehension, or detention of individuals suspected or convicted of [criminal] offenses")

or have been transferred from a primary law enforcement position into a supervisory or

administrative position. 5 U.S.C. § 8331(20) (2000). An employee can meet the

definition of a LEO by either serving in an approved LEO position or by applying to the

---

[1]      Sections 401-407 and 412 of FLEPRA are found, as amended, at 5 U.S.C. § 5305 note (2000) (§ 407 repealed by Pub. L. No. 108-411, § 101(d) (2004)). Section 408 is codified at 5 U.S.C. §§ 4521-4523, 5541 note; § 409 at 5 U.S.C.§ 8335 and 5 U.S.C. § 8425; § 410 at 5 U.S.C. 5542, 5547 (repealed in part by Pub. L. No. 102-378, § 2(43), 106 Stat. 1346, 1352 (1992)); and § 411 at 5 U.S.C. § 5541.

[2]      The relevant retirement statutes for LEOs provide for retirement benefits in the form of annuity payments for federal LEOs who have reached the age of fifty and have completed twenty years of service as a LEO. See 5 U.S.C. § 8336(c) (2000).

04-5034                                        2

employing agency for LEO credit based on the circumstances of his or her service. 5 C.F.R. §§ 831.903, 831.906 (2004).

The Merit Systems Protection Board ("the Board") undisputedly has jurisdiction over claims for LEO retirement credit under the CSRA. See United States v. Fausto, 484 U.S. 439 (1988). In contrast to the CSRA, the FLEPRA is a separate money-mandating statute that requires the payment of supplemental pay to federal employees who satisfy both the criteria for supplemental pay and the statutory definition of "law enforcement officer."

The Drug Enforcement Agency ("DEA") employs diversion investigators ("DIs") (formerly known as compliance investigators) to investigate the diversion of legal but controlled substances from legitimate channels of commerce to illegitimate ones. DIs work to determine compliance with the Controlled Substance Act ("CSA") and may also take part in investigations of criminal activity. DIs investigate manufacturers and distributors of controlled substances in order to assure compliance with the CSA and that no improper diversion of controlled substances has occurred. And even though DIs may participate in criminal investigations, they may not carry firearms. DEA memos (hereinafter referred to as the "Miller-Mullen Memoranda") further established that DIs were not to participate in undercover activities of any kind, execute arrest or search warrants, direct or pay informants, or conduct moving surveillance. Furthermore, at the time Mr. Crowley served as a DI, DIs had no physical fitness requirements, age

requirements, or agency-imposed obligations to be on call twenty four hours a day.[3]

The appellee in this case began his career in the DEA as a DI serving in the Boston Metropolitan area. His career as a DI lasted from March 12, 1973 to June 15, 1986. On June 16, 1986, he began work as a Group Supervisor in the Boston regional office of the DEA. He remained in that position until February 25, 1991, when he was transferred to DEA headquarters in Arlington, Virginia. There, he took the position of staff coordinator for the Office of Diversion Control. On October 31, 1994, Mr. Crowley was transferred back to the DEA's Boston Office, where he resumed his duties as Group Supervisor. In April 2001, he was made Special Assistant to the Diversion Program Manager and stayed in that position until his retirement on October 1, 2001.

The appellee sought and received retirement credit for primary LEO service from the Office of Personnel Management ("OPM"), arguing that his service as a DI qualified as primary LEO service. He also successfully sought LEO service credit for the period between June 16, 1986 and September 30, 1991, covering all of his initial service as Group Supervisor in Boston and part of his service as staff coordinator for the Office of Diversion Control in Arlington.[4] He argued before the OPM that his secondary service qualified him for FLEPRA pay because he was transferred directly to those secondary

---

[3]    This court has already had an opportunity to pass on the LEO status of DIs in a previous case. See Hannon v. Dep't of Justice, 234 F.3d 674, 675-76 (Fed. Cir. 2000) ("Hannon II"). Though the analysis in Hannon II is not entirely applicable to the instant case for reasons that shall become clear later in this opinion, it has some relevance to our analysis.

[4]    Before the Court of Federal Claims, the appellee argued that the government was judicially and/or collaterally estopped from arguing that he was not entitled to primary LEO credit as a result of OPM's initial determination that he was indeed entitled to such credit. That argument was rejected by the court and has not been raised here.

LEO positions from a primary LEO position.[5] In 1992, after receiving LEO credit for the period between March 12, 1973 and September 30, 1991, Mr. Crowley began to apply annually to the OPM for LEO retirement coverage for his supervisory and administrative work. He applied in 1992 for LEO status for the work he performed in fiscal year ("FY") 1992. In 1993, he did the same for FY 1993. The OPM acted on neither request. On December 7, 1993, the Department of Justice ("DOJ"), pursuant to the OPM's delegation of its authority to determine the LEO status of DEA employees, took responsibility for deciding Mr. Crowley's LEO status. See 58 Fed. Reg. 64,366 (Dec. 7, 1993).

After 1993, the appellee annually applied to the DOJ to expand his LEO credit for each subsequent year he served in a supervisory or administrative position. In August of 1994, the DOJ informed him that his staff coordinator position counted as a secondary position for which primary law enforcement experience was required. Thus, he was conferred LEO status for his service as staff coordinator to the Office of Diversion Control. In 1999, the DOJ reversed course, declared the appellee's staff coordinator position to be a position that did not qualify for LEO credit, and denied his requests for LEO retirement credit for his service between October 1, 1991 and June 15, 1997. That same year, Mr. Crowley applied one last time to the DOJ for LEO credit

---

[5] In order to qualify for supplemental pay under the FLEPRA, Mr. Crowley must show that he served in a primary LEO position and was properly transferred from that position to a valid secondary (administrative or supervisory) LEO position. If Mr. Crowley cannot prove either that he served in a primary LEO position or that his secondary positions were valid LEO positions, he does not qualify for supplemental pay under the FLEPRA.

for the period covering June 16, 1997 to June 16, 1998. The DOJ has never acted on that request.

In response to the DOJ's denial of his requests for LEO status, the appellee filed a complaint with the Board for LEO retirement credit and, concurrently, a complaint in the Court of Federal Claims to recover supplemental pay under the FLEPRA for the period covering October 1, 1991 to October 1, 2001. Before the Board could take up his retirement claims, it stayed Mr. Crowley's action for retirement credit in order to allow him to pursue his FLEPRA claim before the Court of Federal Claims. With the Board's stay in place, the Court of Federal Claims proceeded to consider and decide the appellee's FLEPRA claim.

In a series of rulings dealing with the LEO status of DIs in general and of this appellee in particular, the Court of Federal Claims determined that: (1) it had jurisdiction to hear a DI's FLEPRA claims; (2) the appellee was entitled to LEO status both for his service as a DI and also for his service in secondary drug enforcement positions within the DEA; (3) the appellee was not required to exhaust his administrative remedies since the DOJ had already determined its position regarding his LEO status; and (4) the Back Pay Act provided the waiver of sovereign immunity that would permit the appellee to recover pre-judgment interest from the federal government for his FLEPRA claims. See generally Hannon v. United States, 48 Fed. Cl. 15 (2000) ("Hannon I"); Crowley v. United States, 53 Fed. Cl. 737 (2002) ("Crowley I"); Crowley v. United States, 56 Fed. Cl. 291 (2003) ("Crowley II"); Crowley v. United States, 57 Fed. Cl. 376 (2003) ("Crowley III").

In determining that the appellee is entitled to LEO status, the Court of Federal Claims undertook a de novo interpretation of 5 U.S.C. § 8331(20), stating that "the simple words of the statute offer sufficient and clear guidance." Crowley I, 53 Fed. Cl. at 777. Under its interpretation of the plain meaning of the statute, the Court of Federal Claims determined that the appellee's service as a DI was covered by the statutory definition of "law enforcement officer." Id. at 768-74. As an alternative basis, the Court of Federal Claims examined Mr. Crowley's experiences as a DI in light of this court's precedential rulings in Bingaman v. Department of the Treasury, 127 F.3d 1431 (Fed. Cir. 1997); Hannon II, 234 F.3d 674; Watson v. Department of the Navy, 262 F.3d 1292 (Fed. Cir. 2001); and Hall v. Department of the Treasury, 264 F.3d 1050 (Fed. Cir. 2001). Using the six factors identified in Bingaman, the Court of Federal Claims determined that, in light of his personal experiences as a DI in the DEA, the appellee merited being granted primary LEO status under 5 U.S.C. § 8331(20). The appellee thus satisfied the necessary prerequisites for the award of FLEPRA supplemental pay for his service in DEA supervisory or administrative positions. Crowley I, 53 Fed. Cl. at 774-88.

The United States now raises four issues on appeal from the Court of Federal Claims: (1) whether the Court of Federal Claims had jurisdiction to determine Mr. Crowley's LEO status; (2) whether Mr. Crowley properly qualified as a LEO under our precedent; (3) whether Mr. Crowley was required to exhaust his administrative remedies before asserting his claim in the Court of Federal Claims; and (4) whether the federal government had clearly and unambiguously waived its sovereign immunity on pre-

04-5034                                    7

judgment interest for awards granted under the FLEPRA. We have jurisdiction to hear this appeal under 28 U.S.C. § 1295(a)(3).

## DISCUSSION

We review the Court of Federal Claims' conclusions of law de novo and all of its findings of fact for clear error. Heisig v. United States, 719 F.2d 1153, 1157-58 (Fed. Cir. 1983). Legal analysis involving the application of law to the facts is a legal question that is reviewed de novo. See Litton Indus. Prods., Inc. v. Solid State Sys. Corp., 755 F.2d 158, 164 (Fed.Cir.1985) (requiring reversal "if the court engaged in a faulty analysis in applying the law to the facts and a correct application of the law to those facts might bring a different result").

### A. The Jurisdiction of the Court of Federal Claims

As previously stated, the Tucker Act confers jurisdiction on the Court of Federal Claims. 28 U.S.C. § 1491(a)(1) (2000). But the Tucker Act alone does not create a substantive claim against the federal government for money damages. See Martinez v. United States, 333 F.3d 1295, 1302-03 (Fed. Cir. 2003) ("The actions for which the Tucker Act waives sovereign immunity are . . . actions brought pursuant to money-mandating constitutional provisions, statutes, regulations and executive orders. The Tucker Act does not itself provide the substantive cause of action." (internal citations omitted)).

No party in this litigation disputes that the FLEPRA is a money-mandating statute. Indeed, the FLEPRA is very explicit as to what is to be paid LEOs. As § 404 of the FLEPRA states,

> [E]ach law enforcement officer whose post of duty is in one
> of the [enumerated metropolitan areas] shall receive an

> adjustment [in their pay], which shall be a percentage of the officer's rate of basic pay . . . .

5 U.S.C. § 5305 note. The statute is clear—if a LEO works in a statutorily defined metropolitan area, that LEO is entitled to a pay adjustment depending on the metropolitan area in which he or she worked. Thus, the FLEPRA is a money-mandating statute. The substantive cause of action in this case is the FLEPRA, but the grant of jurisdiction in the Court of Federal Claims is properly found in the Tucker Act. 28 U.S.C. § 1491(a)(3).

Notwithstanding obvious jurisdiction under the Tucker Act, the appellant in this case argues that because United States v. Fausto, 484 U.S. 439 (1988), gives the Board exclusive jurisdiction over retirement claims brought under the CSRA, and because the statutory definition of "law enforcement officer" is found in the retirement statutes and a successful showing of LEO status is an element of a 5 U.S.C. § 8336(c) claim for retirement benefits, only the Board (as opposed to the Court of Federal Claims) has jurisdiction to hear a case that turns on the determination of LEO status. This argument, while creative, is unpersuasive.

A positive determination of LEO status is a necessary element to successful recovery for both CSRA retirement claims brought before the Board and also for pay adjustment claims brought under the FLEPRA before the Court of Federal Claims. There can be no dispute that CSRA retirement claims must go before the Board and that FLEPRA cases must go before the Court of Federal Claims. And courts have jurisdiction over claims—not over elements of claims. Given that the Court of Federal Claims has jurisdiction over FLEPRA claims via the Tucker Act, it also has jurisdiction to make the legal and factual determinations necessary to resolving those claims.

The government argues that the Court of Federal Claims' jurisdictional finding raises the possibility of contradiction and lack of uniformity in future LEO determinations because the Board will determine LEO status for retirement purposes and the Court of Federal Claims will determine LEO status for FLEPRA purposes. The mere potential for lack of uniformity does not change our jurisdictional analysis. Indeed, it is our task to state the law that must be applied both by the Board and the Court of Federal Claims. Clear guidance from this court can mitigate any risk of contradiction between the Board and the Court of Federal Claims.

Furthermore, as the Court of Federal Claims correctly pointed out in Hannon I, Congress merely incorporated the definition of LEO from the retirement statutes into the FLEPRA—in doing so, it did not also incorporate the review mechanisms associated with the retirement statutes. Hannon I, 48 Fed. Cl. at 23. Furthermore, because the Board's jurisdiction is limited, it cannot hear FLEPRA claims. Thus, if the government's position were correct, a claimant would first have to pursue a perhaps undesired retirement claim before the Board in order to be able to litigate his or her FLEPRA pay claim before the Court of Federal Claims. There is no language in the FLEPRA to support such an odd result. And we do not construe statutes in ways that lead to such a result if we can avoid doing so. See, e.g., In re Chapman, 166 U.S. 661, 667 (1897) ("[N]othing is better settled, than that statutes should receive a sensible construction, such as will effectuate the legislative intention, and, if possible, so as to avoid an unjust or an absurd conclusion.").

Accordingly, insofar as the question of the jurisdiction of the Court of Federal Claims to make LEO determinations in deciding FLEPRA claims is concerned, we affirm the Court of Federal Claims' assertion of jurisdiction.

## B.  The Appellee's LEO Status

Our analysis of the appellee's request for LEO status is governed by our relevant precedent.  That precedent is binding on this court as it is binding on the Court of Federal Claims.  In its opinion, the Court of Federal Claims chose to begin by undertaking the interpretation of 5 U.S.C. § 8331(20) de novo and, in the alternative, analyzing this case under our precedent.  We reject the court's initial de novo interpretation of § 8331(20) because the Court of Federal Claims may not deviate from the precedent of the United States Court of Appeals for the Federal Circuit any more than the Federal Circuit can deviate from the precedent of the United States Supreme Court.  Trial courts are not free to make the law anew simply because they disagree with the precedential and authoritative analysis of a reviewing appellate court.

A LEO, under the statutory definition, is one who primarily "investigat[es], apprehen[ds] or det[ains]" those suspected of federal crimes.  5 U.S.C. § 8331(20).  His or her primary duties are those that:

  i Are paramount in influence or weight; that is, constitute the basic reasons for the existence of the position;

  ii Occupy a substantial portion of the individual's working time over a typical work cycle; and

  iii Are assigned on a regular and recurring basis.

5 C.F.R. §§ 831.902, 842.802 (2004). Generally, an employee who spends at least half of his or her working time on the investigation, apprehension or detention of criminal suspects is considered to be one whose duties are primarily law enforcement. Id.

Our current precedent regarding the LEO status of federal employees has evolved from a case-by-case factor specific framework to a position-oriented framework supplemented by the individual facts presented by each case.

### 1. The case-by-case framework

The case-by-case framework was first articulated by the Board in Hobbs v. Office of Personnel Management, 58 M.S.P.R. 628 (1993), and later adopted by this court in Bingaman. Bingaman, 127 F.3d at 1436. This framework relied on articulated factors and an individual employee's actual work experience to determine whether or not a federal employee was a LEO. These factors were to be considered as a whole and weighed by the Board on a case-by-case basis.

In Hobbs, the Board relied on the legislative history behind 5 U.S.C. § 8331(20) to establish a series of factors that would help in determining an employee's LEO status. Accordingly, the Board construed the term "investigation" in § 8331(20) to mean "criminal investigation" or, specifically, the "investigation of suspected or known criminals for the immediate purpose of criminally prosecuting them if warranted." Hobbs, 58 M.S.P.R. at 633. The Board went on to identify hazard and physical stamina requirements as integral to a LEO determination. In deciding the case, the Board relied on six factors to determine that Hobbs's position as a special inspector for the Bureau of Alcohol, Tobacco and Firearms was not a law enforcement position for the purposes of § 8331(20). Those factors were: 1) contact with suspected or known criminals; 2)

authorization to carry a weapon and requirement to maintain proficiency in using a weapon; 3) giving Miranda warnings to witnesses interviewed in the course of investigation; 4) requirement to be on call twenty four hours a day; 5) working overtime frequently; and 6) requirement to maintain a level of physical fitness.  See Hobbs, 58 M.S.P.R. at 633 n.5.

Four years after Hobbs, we adopted the Hobbs factors for ourselves in Bingaman.  Bingaman, 127 F.3d at 1436.  There, we affirmed the Board's denial of LEO status based on an analysis of the facts performed under the rubric of Hobbs.  In Bingaman, we specifically adopted the six Hobbs factors and explained, "while the scope of the statutory category of 'law enforcement officer' cannot be crisply defined with a single phrase, the set of factors the Board has developed [in Hobbs and afterward] captures the essence of what Congress intended."  Id.

In December of 2000, we applied the Hobbs-Bingaman factors to a case involving a DI's request for LEO retirement credit.  See generally Hannon II, 234 F.3d at 674.  In that case, which was similar to this one on the facts and which will be discussed more thoroughly below, we affirmed the Board's determination that a DI who failed to meet four of the six Hobbs-Bingaman factors was not a LEO under § 8331(20).  Id. at 677-82.

Finally, in Hall, we affirmed the Board's denial of LEO retirement credit to a Canine Enforcement Officer of the Customs Service.  Hall described the Hobbs-Bingaman factors as being "a set of tools to assist the Board in gauging whether an employee's assigned activities properly fall within the scope of the law enforcement duties recognized by and contained within the statutory ambit" of the retirement statutes

dealing with LEOs.  Hall, 264 F.3d at 1056.  Thus, in our view, the factors "were not set forth as a substitute for the statute, but rather as a framework for the factual inquiry needed to ascertain coverage under the statutory scheme."  Id.

## 2.  The position-oriented framework

Watson marked a further step in the evolution of the case-by-case framework first adopted in Bingaman.[6]  There, we adopted the Board's new position-oriented approach, which "more affirmatively considered the reasons for the creation and existence of positions than . . . the officers' actual, even if incidental or occasional, duties."  Watson, 262 F.3d at 1295.  The actual duties carried out by federal employees would be relevant only if they run counter to the reasons for the existence of their positions.  Id. at 1300-01.

In addition to adopting the position-oriented approach, the court identified the five "most probative" factors in determining a federal officer's entitlement to LEO status. Those five factors are:

> 1) whether the officers are merely guarding life and property
> or whether the officers are instead more frequently pursuing
> or detaining criminals; 2) whether there is an early
> mandatory retirement age; 3) whether there is a youthful
> maximum entry age; 4) whether the job is physically
> demanding so as to require a youthful workforce; and 5)
> whether the officer is exposed to hazard or danger.

Id. at 1303.  In addition, the Hobbs-Bingaman factors "may be considered as necessary and appropriate."  Id.  The court explained this shift as being necessary to better

---

[6]    Though Hall issued at roughly the same time as Watson and did not explicitly adopt the position-oriented approach, our subsequent cases show that the Watson framework controls any LEO analysis done by this court.  See generally Koenig v. Dep't of the Navy, 315 F.3d 1378 (Fed. Cir. 2003).

capture whether or not the hazard associated with a position's duties and the physically demanding nature of the work were associated with law enforcement duties. Id. at 1302. Two years after Watson, we followed the position-oriented approach established in Watson in Koenig v. Department of the Navy, 315 F.3d 1378 (Fed. Cir. 2003). Indeed, Koenig used Watson's position-oriented analysis to deny LEO status to the police officer appellant in that case.

It is clear from Koenig that the Watson position-oriented approach is the operative test for this court's review of a federal employee's LEO status.[7] As the Board noted, such an approach is more in keeping with the original language of the relevant statutes than an analysis of an employee's actual duties. See Watson v. Dep't of the Navy, 86 M.S.P.R. 318, 320-21 (2000) (construing 5 U.S.C. § 8331(20) ("'[L]aw enforcement officer' means an employee, the duties of whose position are primarily the investigation, apprehension or detention of individuals suspected or convicted of [criminal] offenses.") (emphasis added)).

3. Relevant considerations in the position-oriented framework

In applying the position-oriented approach, we consider the relevant factors established by Bingaman and Watson in determining whether or not a position, not an employee, is entitled to LEO status. And, as in Watson, evidence of an individual

---

[7] We decline the government's invitation to decide this case by using Hannon II as decisive precedent. Hannon II was decided prior to the adoption of the position-oriented approach. The entire analysis in Hannon II was conducted using the Hobbs-Bingaman factors. We cannot now graft a position-oriented analysis onto Hannon II where none previously existed. We will, however, use Hannon II in evaluating whether Mr. Crowley's actual duties satisfy the factors relevant to determining whether or not his actual experience contradicted the reasons for his position's existence.

04-5034                                    15

employee's activities will be considered insofar as it substantially conflicts with our position determination.

As previously noted, our cases offer an array of factors to be considered in applying the position-oriented approach to our review of LEO determinations. Both Watson and Hall used different factor-based tests to aid their review of LEO determinations. Prior to Watson, the Hobbs-Bingaman factors were predominant in this court's review of LEO determinations. While Watson identified five factors that it held to be of primary importance, it did not do away with the Hobbs-Bingaman factors. It instead allowed those factors to be considered "as necessary and appropriate" in addition to its five enumerated factors. Watson, 262 F.3d at 1303.

In reviewing the rationale behind the Watson factors, the Hobbs-Bingaman factors and this court's opinions in Bingaman, Hannon II, Hall, Watson and Koenig, two factors predominate over all others. Indeed, it could be said that certain identified factors are really proxies for the two main considerations behind our LEO cases.

The most important consideration in our position-oriented approach of LEO determinations is the physical vigorousness required by the position in question. As we noted in Bingaman, the legislative history behind § 8331(20) emphasized that LEO positions "should be composed, insofar as possible, of young men and women physically capable of meeting the vigorous demands of occupations which are far more taxing physically than most in the federal service." Bingaman, 127 F.3d at 1435 (quoting S. Rep. No. 93-948, at 2 (1974), reprinted in 1974 U.S.C.C.A.N. 3698, 3699). In Hannon II, Watson, and Hall, we likewise pointed out that physical vigorousness was a factor of utmost importance in determining LEO status. Hannon II, 234 F.3d at 677-

78; Watson, 262 F.3d at 1302; Hall, 264 F.3d at 1058 ("We agree with the Board's analysis in Hobbs that the relevance of hazard to a LEO analysis is that physical stamina and vigor are necessary to overcome such hazards.").

The preeminence of a position's physical vigorousness in determining whether or not a federal position qualifies for LEO status is further supported by the legislative history behind § 8331(20). See S. Rep. No. 93-948, at 2 (1974), reprinted in 1974 U.S.C.C.A.N. 3698, 3699; see also 5 U.S.C. § 8401(17)(A)(ii) (2000) (referring to the definition of "law enforcement officer" in the Federal Employees Retirement System as being an employee whose duties "are sufficiently rigorous that employment opportunities should be limited to young and physically vigorous individuals"); S. Rep. No. 99-166, at 41 (1985), reprinted in 1986 U.S.C.C.A.N. 1405, 1446 (asserting that, for the purposes of the Federal Employees Retirement System, a law enforcement officer was intended to be "an employee with rigorous law enforcement duties that require young and vigorous individuals"). Thus, as evidenced by the relevant legislative history and our precedents, physical vigorousness is the sine qua non of LEO status determinations. Absent a showing of a position's requirement of physical vigorousness, an employee cannot successfully show LEO status.

All of the factor-based tests have attempted to devise factors that could help in determining the physical vigorousness required by a position. For example, in the Hobbs-Bingaman framework, we considered whether or not an employee worked for long periods without a break, was on call twenty four hours a day and/or was required to maintain a level of physical fitness. Bingaman, 127 F.3d at 1436. Similarly, in Watson, we inquired as to whether a position had an early mandatory retirement age, a youthful

maximum entry age, and physical demands so great as to require a youthful workforce. Watson, 262 F.3d at 1303. These factors, pulled from our precedents, are the exclusive factors that a court should consider in determining whether a position is sufficiently vigorous to qualify for LEO status.

But physical vigorousness is only the first of two inquiries. As a secondary consideration, this court has also examined the hazardousness of a position in LEO determinations. Hazard, while important, is secondary to physical vigorousness because the legislative history emphasizes physical vigor to a greater extent and also because Hall instructs us to use hazard as a secondary indication of physical vigorousness. See Hall, 264 F.3d at 1058. Language in Bingaman, Hannon II and Watson stresses hazardousness as a major factor independent of vigorousness. Given our precedent, it is clear to us that physical vigorousness and hazardousness are the major factors to be considered in determining a federal employee's LEO status.

In Bingaman, we inquired as to whether an employee was authorized to carry a firearm, had frequent contact with criminal suspects and/or interrogated witnesses and suspects (giving Miranda warnings where appropriate). Bingaman, 127 F.3d at 1436. In Watson, we asked whether a position exposed an employee to hazard or danger and whether a position required employees to guard life or property instead of more frequently pursuing or detaining criminals (with guarding life or property as not being LEO activity). Watson, 262 F.3d at 1303. These factors attempted to get to the essence of whether or not a position was hazardous enough to be considered a LEO position. (Indeed, the fifth Watson factor was explicit in identifying hazardousness as an

important factor.) These factors, previously enumerated by this court, are the exclusive factors to be considered in determining a position's hazardousness.

Thus, we hold that there are two major factors that should be considered in determining whether a position should be conferred LEO status. First, and predominant, is the physical vigorousness required by the position. The relevant considerations in any vigorousness determination are whether or not the position brings with it (in order of importance): 1) strenuous physical fitness requirements; 2) age requirements (such as a mandatory retirement age or a maximum entry age); or 3) a requirement that an employee be on call twenty four hours a day.[8] These sub-factors should be evaluated by the Board or the Court of Federal Claims, who must apply the facts to the law to determine which sub-factors, if any, have been satisfied.[9] Once that is complete, the court will have the discretion to weigh the sub-factors in making a vigorousness determination.[10] If the court finds that the position in question did not require vigorousness as herein defined, the LEO inquiry is at its end and the position in

---

[8]    Satisfaction of only the twenty four hour on-call requirement will not satisfy the physical vigorousness factor.

[9]    For ongoing sub-factors (such as twenty four hour on-call requirements) to be satisfied, the position in question must, consistent with regulation, require those factors at least fifty percent of the time.

[10]    In our discussion we use the word "court" to mean either the Court of Federal Claims or the Merit Systems Protection Board, whichever is appropriate to the facts of the case.

question must be deemed to be outside of the scope of 5 U.S.C. § 8331(20).[11] If the position is found to be vigorous, then the second major factor necessary to establish LEO status—hazardousness—must be considered.

To determine hazardousness, a court should consider whether the position (in order of importance): requires frequent and consistent contact with criminal suspects on the part of the employee (including interrogation of suspects and pursuit or detention of criminals); or authorizes the employee to carry a firearm.[12] As in Watson, the hazardousness sub-factors are to be considered under the position-oriented approach. Again, this determination of hazardousness will be at the discretion of the court.[13]

When a court determines that a position fails to qualify for LEO status, the court must afford the employee the opportunity to show that, notwithstanding the absence of a described LEO position, the employee in fact does qualify for LEO credit. This opportunity is necessary since it is possible that agencies will not always keep job descriptions current to match the actual activities of the individuals who occupy described positions. For example, an employee occupying a position that fails to satisfy

---

[11]    In actions before the Board, the burden of proof is on the employee to show that his or her position is entitled to LEO status based on a preponderance of the evidence. 5 C.F.R. § 1201.56(a)(2) (2004). Before the Court of Federal Claims, a plaintiff attempting to qualify for LEO status also bears the burden of proof. 5 C.F.R. § 831.906(a). A plaintiff in the Court of Federal Claims must also show that his or her position is entitled to LEO status by a preponderance of the evidence.

[12]    Satisfaction of the firearm requirement alone will not satisfy the hazardousness factor. There must be some showing of a requirement of frequent and consistent contact with criminals or suspects in order for the hazardousness prong of our inquiry to be met.

[13]    This position-oriented evaluation will be carried out as the analysis in our Watson decision was carried out, with careful examination of the official documentation surrounding the position's existence.

the test for vigorousness or hazard may nonetheless by actual duties be required to satisfy both those tests. The possible conflict between a position based decision and a decision driven by the activities of a particular individual was foreseen by the Board in Watson: "evidence of actual duties performed . . . [must show] that—contrary to the official documentation of the position—'the basic reason for the existence of the position' was actually investigation, apprehension, or detention." Watson, 86 M.S.P.R. at 328. Therefore, the employee has the opportunity to disprove the conflict between the description of the position and the real-life facts of occupying the position. To establish LEO status in this fashion, the employee must, consistent with the regulation, show that fifty percent or more of his or her actual duties were LEO duties (i.e. duties that satisfy the vigorousness and hazardousness requirements for LEO status). A preponderance of the evidence must support the employee's claim.

### 4. Mr. Crowley's case

Applying our test to the facts of this case, we first determine whether Mr. Crowley served in a primary LEO position when he served as a DI for the DEA. If he did not, then our inquiry is at its end. If he did, then we must consider whether he properly transferred to a secondary LEO position.

We begin by using the factors identified above to determine the physical vigorousness required by Mr. Crowley's position as a DI within the DEA.

Throughout Mr. Crowley's DI service with the DEA, nothing in his position description or in any of the official documentation regarding his position articulated a physical fitness requirement. Indeed, DEA memoranda from 1988 and 1989 support that assertion. Furthermore, as the court itself noted, no physical fitness standards or

requirements were ever adopted for DIs by the DEA. Crowley I, 53 Fed. Cl. at 780. The Court of Federal Claims found that Mr. Crowley's position was physically demanding because Mr. Crowley may have been asked to move heavy objects and inspect rooftops on occasion. Crowley I, 53 Fed. Cl. at 780. The court, however, failed to find that Mr. Crowley's position had any strenuous physical fitness requirement. Moreover, this type of incidental physical labor does not satisfy a physical fitness requirement as interpreted by this court. See Hannon II, 234 F.3d at 677.

The Court of Federal Claims also correctly noted that Mr. Crowley's position was not subject to any maximum entry level age requirement or any mandatory retirement age. Id. As a result, Mr. Crowley's position as a DI does not satisfy the age-related factors pertaining to vigorousness.

The final factor in our vigorousness analysis is whether or not Mr. Crowley was required to be on call twenty four hours a day. There was no official requirement that he be on call twenty four hours a day. The Court of Federal Claims points to anecdotal evidence where Mr. Crowley was called in to work irregular hours to support its finding that Mr. Crowley was on call twenty four hours a day. Crowley I, 53 Fed. Cl. at 779. It also pointed to testimony regarding the attitude of Mr. Crowley's superiors towards his general availability. Id. (quoting the Special Agent in Charge of the Portland, Maine DEA office as having testified that he "considered every DEA employee to be at my beck and call"). But anecdotal evidence and testimony regarding general availability is insufficient to show that Mr. Crowley was required by the obligations of his position to be on call twenty four hours a day. Accordingly, under our position-oriented approach, we find that the final vigorousness factor has not been met in this case.

Ordinarily, under the position-oriented approach we articulate here, once a negative determination regarding vigorousness is made, a court need not delve into the hazardousness of an employee's position to determine LEO status. Even if we were to examine the hazardousness of Mr. Crowley's position, however, our result would be unchanged.

It is undisputed that Mr. Crowley's position did not authorize him to carry a firearm. Furthermore, there is no evidence that his position existed for the purpose of pursuing and detaining criminals. And even though the Court of Federal Claims correctly noted that there is some evidence that Mr. Crowley himself did engage in contact with and interrogation of those suspects, nothing in his position description mentions any requirements for contact with or interrogation of criminal suspects.[14] Indeed, the Miller-Mullen Memoranda specifically led DIs away from activity that would tend to lead to contact with criminals and suspects. In short, there is little in the official duties of a DI that would incline us to find the position to be hazardous in nature.

The result of our analysis conforms with our decision in Hannon II. There, we applied the case-by-case framework to determine that a DI did not qualify for LEO status. As in this case, the DI in Hannon II was not authorized to carry a gun, arrest suspects, execute search warrants, control informants or conduct moving surveillance. Hannon II, 234 F.3d at 675. Hannon was also not required to satisfy a physical fitness requirement or be on call twenty four hours a day. Id. at 677. Furthermore, even

---

[14]    The criminal contacts related to Mr. Crowley's career and identified by the Court of Federal Claims are anecdotal at best. Crowley I, 53 Fed. Cl. at 779. They are, therefore, insufficient to show that Mr. Crowley's position required frequent and consistent criminal contact.

though there was anecdotal evidence that Hannon was present at the execution of several searches and occasionally interviewed witnesses and criminal suspects over the course of his seven year career as a DI, we held that he nevertheless did not satisfy the Hobbs-Bingaman factors and, thus, failed to qualify for LEO status. Id. at 678. Although we cannot use Hannon II as controlling authority for our conclusion that DIs are not entitled to LEO status because it precedes the position-oriented framework established in Watson, it does confirm our contention that anecdotal evidence of criminal contact cannot in and of itself confer LEO status on a federal employee. And it provides further persuasive support for our conclusion that a DI is not entitled to LEO status under § 8331(20).

Accordingly, we find that Mr. Crowley's position does not qualify for LEO status under controlling precedent and statutes. Furthermore, on this record, it has not been established by a preponderance of the evidence that fifty percent or more of Mr. Crowley's actual duties were LEO duties. He therefore cannot show that his actual duties conflict with his job description to the extent required to gain LEO status. We thus reverse the Court of Federal Claims' finding that the appellee, Mr. Crowley, was entitled to LEO status under the FLEPRA.

## C. Exhaustion and Pre-Judgment Interest

We do not reach the question of whether Mr. Crowley was required to exhaust his administrative remedies before bringing suit in the Court of Federal Claims or whether he was entitled to pre-judgment interest on any recovery stemming from his FLEPRA claim. Because we have determined that his position did not confer LEO status upon Mr. Crowley, reaching these issues is unnecessary.

CONCLUSION

For the reasons stated above, the Court of Federal Claims' assertion of jurisdiction over FLEPRA claims is affirmed. Its finding that the appellee is entitled to LEO status is reversed.

<u>REVERSED</u>

# United States Court of Appeals for the Federal Circuit

04-5034

JOHN D. CROWLEY,

Plaintiff-Appellee,

v.

UNITED STATES,

Defendant-Appellant.

DYK, <u>Circuit Judge</u>, concurring.

I join the opinion of the court.  I write separately to emphasize that our jurisdictional holding should not be read to require that the two proceedings in cases such as this — one in the Court of Federal Claims for supplemental pay and one before the Merit Systems Protection Board ("Board") for retirement pay — proceed simultaneously.

Both the Court of Federal Claims and the Board are authorized to stay their proceedings pending the outcome of litigation in the other forum, and a decision by one will be collateral estoppel as to the other.  In my view, Congress designated the Board as the primary forum for the resolution of disputes concerning Law Enforcement Officer status entitlement, and the Board has had twenty-seven years of experience administering the statute.  Where claims are filed both in the Court of Federal Claims and before the Board, the Court of Federal Claims should routinely stay its proceedings pending the outcome of Board proceedings, unless the Court of Federal Claims

proceedings are at an advanced stage when the Board proceedings are commenced. Cf. Martinez v. United States, 333 F.3d 1295, 1310 (Fed. Cir. 2003) (en banc) (stays in parallel proceedings before the Court of Federal Claims and the Army Board for Correction of Military Records).