ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of - | ) |
| | ) |
| CBRE Heery, Inc. | ) ASBCA No. 62420 |
| | ) |
| Under Contract No. W9126G-08-D-0056 | ) |

APPEARANCES FOR THE APPELLANT:       Heather F. Shore, Esq.
                                       Brown & Ruprecht PC
                                       Kansas City, MO

                                       Wade Purcell, Esq.
                                       Counsel

APPEARANCES FOR THE GOVERNMENT:      Michael P. Goodman, Esq.
                                       Engineer Chief Trial Attorney
                                     Laura J. Arnett, Esq.
                                       Engineer Trial Attorney
                                       U.S. Army Engineer District, Savannah

OPINION BY ADMINISTRATIVE JUDGE SWEET

This appeal involves a contract to design and build a replacement medical clinic at Seymour Johnson Air Force Base. Appellant CBRE Heery, Inc. (Heery)[1] did not complete the project on time, and the Army Corps of Engineers (Corps) imposed liquidated damages. Heery filed a claim, seeking recovery of its increased costs and remission of the liquidated damages due to government-caused delay. The contracting officer (CO) issued a final decision (COFD) denying the claim.

On appeal, the parties have elected to proceed under Board Rule 11. Heery argues that the Corps' direction to strengthen the door and walls of a room in the Medical Logistics Department after Heery already had installed the door and walls constituted a constructive change, and breached the government's duty of good faith and fair dealing. The government responds that the contract documents required the room's door and walls to be strengthened because the contract documents mandated that: (1) the room be a

---

[1] Heery International, Inc. signed the contract documents (R4, tab 3.01 at 113, tab 3.06 at 2210-11). On December 15, 2017, CBRE Heery, Inc. entered into a change of name agreement with the government, amending the contract documents to substitute Heery International, Inc. with CBRE Heery, Inc. (R4, tab 2.03) For ease of reference, we refer to both entities as "Heery."

vault for the storage of controlled substances; and (2) Heery comply with applicable codes, criteria, and standards, which required that vaults for the storage of controlled substances have strengthened doors and walls. For the reasons discussed below, we agree with the government, and conclude that there was no constructive change or breach of the duty of good faith and fair dealing. As a result, we deny the appeal.[2]

FINDINGS OF FACT

I. Contract Documents

A. MATOC Contract

1. On September 19, 2008, the Corps awarded Multiple Award Task Order Contact W9126G-08-D-0056 (MATOC Contract) for the United States Air Force (Air Force; collectively with the Corps, government) medical design construction services for federal healthcare facilities to Heery (R4, tab 3.01 at 111-13).

2. The MATOC Contract incorporated by reference Federal Acquisition Regulation (FAR) clause 52.243-4, CHANGES (JUN 2007), which provided that Heery is entitled to an equitable adjustment for any changes that increase its costs of, or time required for, performance (R4, tab 3.01 at 150).

3. The MATOC Contract also included a RESPONSIBILITY OF THE CONTRACTOR FOR DESIGN (MAY 2002) Clause, which provided that:

(a) The Contractor shall be responsible for the professional quality, technical accuracy, and the coordination of all designs, drawings, specifications, and other non-construction services furnished by the Contractor under this contract. The Contractor shall, without additional compensation, correct or revise any errors or deficiencies in its designs, drawings, specifications, and other non-construction services and perform any necessary rework or modifications . . . resulting from the design error or omission.

(b) The standard of care for all design services performed under this agreement shall be the care and skill ordinarily used by members of the architectural or engineering professions practicing under similar conditions at the same time and locality. Notwithstanding the above, in the event that the contract specifies that portions of the Work be

---

[2] Because we find for the government on entitlement, we do not address the alleged number of days of delay or quantum, and deny the government's motion to strike.

performed in accordance with a performance standard, the design services shall be performed so as to achieve such standards.

(c) Neither the Government's review, approval or acceptance of, nor payment for, the services required under this contract shall be construed to operate as a waiver of any rights under this contract or of any cause of action arising out of the performance of the contract.

(R4, tab 3.01 at 176-77)[3]

B. 0039 RFP

4. On November 30, 2012, the government issued Request for Proposal No. W912HN-12-R-0039 (0039 RFP) against the MATOC Contract for the design and construction of a replacement medical clinic at Seymour Johnson Air Force Base in North Carolina (R4, tab 3.02 at 352-54). The 0039 RFP included an order of precedence clause, which indicated that codes, criteria, and standards took precedence over the program for design (PFD), which took precedence over the drawings (R4, tab 3.02 at 271-72).

5. First in order of precedence, the 0039 RFP included a list of codes, criteria, and standards with which a contractor had to comply. Among the enumerated codes, criteria, and standards was United Facilities Criteria (UFC) 4-510-01 (Design: Medical Military Facilities) (R4, tab 3.02 at 1485). UFC 4-510-01 assigned a "Secure Storage, Cage" the room code "SSC01," and a "Secure Storage, Vault," the room code "SSV01" (R4, tab G-37 at 348). For a Secure Storage, Vault (SSV01), the doors and walls had to be "[s]pecial. Determined by the Design and Construction Agent in coordination with the Using Military Department" (*id.* at 320-22, 348).

6. The parties treat Army Regulation (AR) 190-51 as the government's special determination, agreeing that Heery had to comply with AR 190-51 (app. br. at 8; gov't br. at 28). AR 190-51, Appendix B-3 addressed vaults for the storage of controlled substances in particular. It required new doors for all risk levels[4] be "Class 5 vault doors [or to] . . . provide delay equal to or greater than the response time," which we refer to as

---

[3] We use the Bates numbers, where available.

[4] Neither AR 190-51, nor the parties, define the risk levels. In any event, as discussed below, Heery's 100 percent corrected final design and the original door and walls it installed in Room 1919 did not meet AR 190-51, Appendix B-3's requirements for any risk level.

3

class 5 or similar doors.[5] (R4, tab 7.03 at 12626)  AR 190-51, Appendix B-3 also required walls for risk levels I and II to:

> [B]e constructed of a minimum of 8-inch-thick concrete reinforced vertically and horizontally on each face with ½ inch diameter reinforcing bars placed 9 inches on center and staggered to form a grid approximately 4 ½-inches square or with 8-inch thick reinforced concrete masonry with ½-inch diameter reinforcing bars placed at 8 inches on center in block cells filled with grout or mortar and with horizontal joint reinforcement at every course.  Alternatively, walls may be constructed to provide delay equal to or greater than the response time.

(*Id.*)  Walls for risk level III only could have the reinforced concrete option enunciated for risk levels I and II (*id.*).

7.  UFC 4-510-01 also stated that "[f]eatures to be considered for vault storage areas are outlined in 21 CFR 1301.72" (R4, tab G-37 at 237).  Under 28 C.F.R. § 1301.72(a) (together with AR 190-51, Appendix B-3, Controlled Substance Vault Standards), more than small amounts of schedule I and II controlled substances[6] must be stored in a "vault."  If constructed after September 1, 1971, that vault must have a door that provides for "30 man-minutes against surreptitious entry, 10 man-minutes against forced entry, 20 man-hours against lock manipulation, and 20 man-hours against radiological techniques," which we refer to as delayed entry.  *Id*. at § 1301.74(a)(3)(ii). The vault also must have "walls constructed of at least 8 inches of reinforced concrete or other substantial masonry, reinforced vertically and horizontally with ½-inch steel rods tied 6 inches on center, or the structural equivalent."  *Id*. at § 1301.74(a)(3)(i).  Under 28 C.F.R. § 1301.72(b), schedule III, IV, and V controlled substances may be stored in various structures, including a safe, a "vault," or a cage.  *Id*. at § 1301.72(b).  However, if a vault is used, then that vault must meet the requirements of 28 C.F.R. § 1301.72(a) (*id*. at § 1301.72(b)(2)).

8.  Heery's architect admitted that 21 C.F.R. § 1301.72 governed the storage of controlled substances (R4, tab G-22 (Matalon dep.) at 44-45, tab G-26 (Edney dep.) at 13-14).

---

[5] A class 5 door is "[a] large GSA certified steel door, typically like what you would believe a bank would have" (app. supp. R4, tab A-24 (Snow dep.) at 4).

[6] Schedules I, II, III, IV, and V enumerate controlled substances, with substances in the lower numbered schedules having a higher potential for abuse, lower currently accepted medical use, and/or less accepted safety for use under medical supervision.  21 U.S.C. § 812.

4

9.  Second in order of precedence, the 0039 RFP included a PFD, which contained a narrative and table describing each department.  The PFD was inconsistent about whether the Medical Logistics Department's storage room (Room 1919)[7] would be a vault.  On the one hand, the PFD table indicated that the Medical Logistics Department include a "Secure Storage Vault."  On the other hand, the PFD table assigned Room 1919 the SSC01 room code that UFC 4-510-01 used for a Secure Storage, Cage, instead of the SSV01 room code that UCF 4-510-01 used for a Secure Storage, Vault.  (R4, tab 3.02 at 742-43, 799)  Moreover, the PFD was inconsistent about whether Room 1919 would store controlled substances.  The PFD narrative merely stated that the Medical Logistics Department would provide acquisition and inventory control services by receiving and storing materials in bulk stores areas, without specifying whether those materials would include controlled substances.  (R4, tab 3.02 at 755-56)  However, the PFD clearly required a vault for the storage of controlled substances in another department—the Pharmacy Department.  The PFD narrative indicated that the Pharmacy Department would provide for the "storage of pharmaceuticals . . . (including adequate storage of controlled substances in a dedicated vault)."  (R4, tab 3.02 at 742)

10.  Third in order of precedence, the 0039 RFP included several drawings.  The 0039 RFP drawings were inconsistent about whether Room 1919 was to be a vault or cage.  On the one hand, the 0039 RFP drawings labeled Room 1919 as a "Secure Storage Vault."  On the other hand, Room 1919 had dashed-line walls.  (R4, tab 3.03 at 1-3)  The 0039 RFP drawings clearly required a vault in the Pharmacy Department by labeling a room in the Pharmacy Department a "Vault Room," and using solid-line walls for that room (*id*. at 1).

C.  Heery's Proposal

11.  On February 7, 2013, Heery submitted a technical proposal in response to the 0039 RFP (R4, tab 3.04 at 2051).

12.  Heery's technical proposal included a drawing, which showed a "Secure Storage Vault" room in the Medical Logistics Department with dashed-line walls, and a "Vault Room" in the Pharmacy Department with solid-line walls (R4, tab 3.04 at 2103).

13.  Heery's proposal also indicated that it would validate the layout of individual departments with the government at a design charrette with a process mapping session

---

[7] The Medical Logistics Department storage room was not originally labeled Room 1919; that designation came later (*compare* R4, tab 3.03 at 1-3 *with* R4, tab G-36 at 2).  However, for the sake of consistency, we refer to the disputed room in the Medical Logistics Department that eventually became Room 1919 as "Room 1919," even when referring to that room prior to it being labeled Room 1919.

that would track the critical flow of, *inter alia*, medication and medical supplies (R4, tab 3.04 at 2055).

D. TO CV01

14. On September 13, 2013, the Corps awarded Task Order (TO) CV01 on the MATOC Contract to Heery, which incorporated the 0039 RFP's codes, criteria, and standards requirement, and the PFD, discussed above (R4, tab 3.06 at 2210, 2702-03, 2715-16).

15. The original contract duration was 1,095 calendar days from the date of the issuance of the notice to proceed (R4, tab 3.06 at 2229). The Corps issued the notice to proceed on October 24, 2013, making the original contract completion date (CCD) October 23, 2016 (*see* R4, tab 3.07). Through modifications, the parties extended the CCD by 434 calendar days to December 31, 2017 (R4, tab G-19 at 5). TO CV01 authorized liquidated damages in the amount of $1,512 per calendar day that the contractor was late in completing it (R4, tab 3.06 at 2229).

II. Performance

A. Design Charrette

16. Between December 2, 2013, and December 12, 2013, Heery, the Corps, and the Air Force held a design charrette (R4, tab 8.01 at 12670), with separate meetings for each department (R4, tab G-45 (Bennett decl.) ¶ 6). The purpose of the design charrette was to confirm the design requirements, and implement any changes or clarifications desired by the Air Force (*id.*; app. supp. R4, tab A-35 (Edney aff.) ¶ 91; app. supp. R4, tab A-64 (Matalon aff.) ¶ 80; R4, tab G-22 (Matalon dep. at 61). Attendees on behalf of the Corps included Administrative Contracting Officer (ACO) Stephen Blanchard and Contracting Officer's Representative (COR) Terry Brooks (R4, tab 8.01 at 12695; R4, tab G-28 (Brooks aff.) ¶¶ 4-5, 8; R4, tab G-30 (Blanchard aff.) ¶¶ 4, 6). ACO Blanchard had the authority to interpret and change the contract; COR Brooks did not have that authority (R4, tab G-2, R4, tab G-3, R4, tab G-28 (Brooks aff.) ¶ 5).

17. At the Medical Logistics Department meeting, Air Force Representatives clarified "that the Medical Logistics Vault Room in the new clinic would be used for storage of narcotics" (R4, tab G-29 (Wingate decl.) ¶ 7; *see also* R4, tab G-44 (Peeler decl.) ¶ 5; R4, tab G-45 (Bennett decl.) ¶ 8). Heery acknowledged the Air Force Representatives' clarification, indicating in the meeting minutes, which it prepared, that Room 1919 would store "[n]arcotics" (R4, tab 8.01 at 12690). Thus, the parties replaced Room 1919's dashed-line walls with solid-line walls on the drawings. However, while the drawings continued to label Room 1919 as a "vault," they inconsistently assigned

6

Room 1919 the room code SSC01 that UFC 4-510-01 used for a Secure Storage, Cage. (R4, tab 8.01 at 12742)

18. At the Pharmacy Department meeting, Air Force Representatives informed Heery that the Air Force would use a Pyxis safe—instead of a vault—to store controlled substances (R4, tab G-45 (Bennett decl.) ¶ 7). Heery acknowledged that change, indicating in its meeting minutes that the Pharmacy Department would contain a "Pyxis C2 safe versus a vault," and crossing out the Pharmacy Department Vault Storage on the equipment list and hand writing "ch[a]ng[e] to safe" (R4, tab 8.01 at 12685, 12822). The parties also eliminated the Pharmacy Department Vault on the drawings (id. at 12,744).

19. ACO Blanchard participated in the Medical Logistics Department and Pharmacy Department meetings. He had knowledge that Air Force Representatives clarified that Room 1919 would store controlled substances, and eliminated the Pharmacy Department vault. ACO Blanchard did not object to that clarification and change. (see R4, tab G-30 (Blanchard aff.) ¶¶ 8-9)

20. On January 9, 2014, COR Brooks emailed Heery a revised PFD, and a list of PFD changes (R4, tab G-25 at 304). Having noticed that Room 1919 was mislabeled SSC01, the government changed that room code to SSV01 in the revised PFD (R4, tab 4.01; R4, tab 3.08 at 4049,R4, tab G-45 (Bennett decl.) ¶¶ 12, 15). The list of PFD changes highlighted that the revised PFD changed Room 1919's room code to SSV01 by highlighting the SSV01 Code in purple (R4, tab G-25 at 2430). COR Brooks copied ACO Blanchard on the revised PFD email (id. at 303). ACO Blanchard was aware of the Room 1919 room code change, and did not object (R4, tab G-30 (Blanchard aff.) ¶¶ 10-12).

B. Heery's Designs

21. Heery's 35 percent and 65 percent design drawings acknowledged that Room 1919 would be a vault by labeling it a "Secure Vault," assigning it the corrected SSV01 room code, and using solid-line walls (R4, tabs G-49-50). Heery also provided a 35 percent consolidated design analysis, which acknowledged that the revised PFD changed Room 1919's room code to SSV01 (R4, tab G-30 at 29; see also id. at ¶ 11; R4, tab G-45 (Bennett decl.) ¶ 20).

22. Heery discussed requesting a modification or equitable adjustment for the substantive changes made during the design phase of the project, but made the business decision not to do so because there were so many additions and deletions that the analysis would not be worth the effort (R4, tab G-24 (Kemp dep.) at 42-43, 46-47). Indeed, there is a significant chance that such an analysis would have shown that Heery owed the government money because the PFD revisions reduced the project's total square footage

from 62,577 net square feet to 60,991 net square feet (R4, tab G-30 (Blanchard decl.) ¶ 15, ex. C at 32; *see also* R4, tab G-24 at 42).

23. In two separate questions posed to Heery in March 2014, the Corps inquired about the Pharmacy Department vault. In response to both inquiries on March 19, 2014, Heery acknowledged that Room 1919 would store controlled substances by stating that "[a] vault was provided for in the warehouse area [Medical Logistics Department][8] to house high-target medications that are received in the facility. Users did not request a constructed vault within the [Pharmacy] department as they use stand alone safes." (R4, tab 8.02 at 13976, 14013)

24. Heery's 100 percent corrected final design drawings (100 percent design) acknowledged that Room 1919 would be a vault by labeling it "Secure Vault 1919 SSV01," and using solid-line walls (R4, tab G-36 at 2). However, Room 1919's door (Door) did not comply with the Controlled Substances Vault Standards because the 100 percent design's Door was a 1 ¾-inch thick hollow metal door (R4, tab 3.11), but the Controlled Substances Vault Standards required a class 5 door, or a door that delayed entry (R4, tab 7.03 at 12626; app. supp. R4, tab A-1 (Brooks dep.) at 35; app. supp. R4, tab A-64 (Matalon aff.) ¶ 110). Likewise, the 100 percent design's walls (Walls) did not comply with the Controlled Substances Vault Standards because the 100 percent design's Walls were reinforced 16 inches or 48 inches on center (R4, tab 3.10 at 2 § 15, 3 § 11; R4, tab G-19 at 16-17), but the Controlled Substances Vault Standards required reinforcement 6 inches, 8 inches, or 9 inches on center (R4, tab 7.03 at 12626; *see also* app. supp. R4, tab A-35 (Edney aff.) ¶¶ 132, 147-51).

25. The government approved the 100 percent design on January 22, 2015 (R4, tab 3.11; R4, tab G-36).

C. Construction and Dispute Regarding the Walls and the Door

26. Heery began constructing the Walls on December 7, 2015 (R4, tab 6.01 at 5510). Heery installed the Door on April 27, 2016 (*id*. at 6076). Heery originally constructed Room 1919 in accordance with its 100 percent design, such that the Door and the Walls did not comply with the Controlled Substances Vault Standards (app. supp. R4, tab A-35 (Edney aff.) ¶¶ 117, 148; R4, tab G-19 at 19-20; app. supp. R4, tab A-1 (Brooks dep.) 134, 166-67; R4, tab G-24 (Kemp dep.) at 69-70). The Corps inspected the Walls for compliance with the drawings as they were being constructed, but did not know that the 100 percent design failed to comply with the Controlled Substances Vault Standards (app. supp. R4, tab A-85; *see also* app. supp. R4, tab A-78 at 1).

---

[8] The parties agree that the term "warehouse area" in Heery's March 19, 2014 responses referred to the Medical Logistics Department (R4, tab G-19 at 14; app. br. at 30).

27. At an unidentified time after installation, the Air Force determined that the Door was not proper (R4, tab G-29 (Wingate decl.) ¶ 14, tab G-31 (MacConnell decl.) ¶ 9). Air Force personnel expressed their concerns to COR Brooks (R4, tab G-31 (MacConnell decl.) ¶ 9).

28. On May 9, 2017, COR Brooks expressed his concerns to Heery that the Door did not satisfy 21 C.F.R. § 1301.72 (R4, tab G-46 (Brooks decl.) ¶ 12); app. supp. R4, tab A-79 (Kemp aff.) ¶ 65).

29. On May 11, 2017, Heery responded to COR Brooks that the Door was not a pharmacy vault door requiring compliance with 21 C.F.R. § 1301.72, and any change would require a modification (app. supp. R4, tab A-84 at 4-5).

30. On May 11, 2017, COR Brooks responded that he did not see how a modification was required because, since Room 1919 would store controlled substances, the Door had to comply with AR 190-51, Appendix B-3. COR Brooks also raised concerns that the Walls did not satisfy AR 190-51. (App. supp. R4, tab A-84 at 1) In a separate email to Heery that same day, Mr. Brooks questioned whether the Door satisfied AR 190-51 for controlled substances, and reiterated his concern about the Walls (app. supp. R4, tab A-85 at 722).

31. On May 12, 2017, Heery responded by describing the Walls' reinforcement (R4, tab G-16 at 923).

32. On May 26, 2017, Heery emailed the Corps indicating that, if Room 1919 was to contain controlled substances, then Heery would have to replace the Walls (app. supp. R4, tab A-61).

33. On May 31, 2017, ACO Blanchard informed Heery that the Door did not appear to satisfy AR 190-51, Appendix B-3 and that the Walls did not appear to satisfy 21 C.F.R. § 1301.71. ACO Blanchard asked Heery to produce documentation or test reports indicating that the Door satisfied AR 190-51, Appendix B-3, and to respond to the Corps' concerns regarding the Walls. (R4, tab 4.03)

34. On June 5, 2017, Heery emailed the Corps recommending the installation of an aluminum security mesh lining along the Walls (R4, tab G-16 at 2-4, tab G-46 (Brooks decl.) at ¶ 14).

35. On June 8, 2017, the government confirmed that it would accept the installation of security mesh (R4, tab 4.04).

36. On June 19, 2017, COR Brooks indicated that the mesh had to be steel. He also noted that the Door issue "is still in your court." (R4, tab G-16 at 5)

37. On June 27, 2017—47 days after its last communication regarding the Door—Heery proposed to COR Brooks that Heery install a class 5 safe instead of replacing the Door. COR Brooks responded on June 28, 2017 that a safe would not be satisfactory because many of the controlled substances would enter on pallets or boxes, and would not be broken down until needed in the Pharmacy, so the Air Force wanted to be able to spread the substances out on the shelves. (App. supp. R4, tab A-42)

38. On July 21, 2017, Heery provided a recommended method for reinforcing the Walls with steel security mesh (R4, tab 4.05).

39. In a July 25, 2017 email to Heery, COR Brooks accepted Heery's proposed method for reinforcing the Walls with steel security mesh. COR Brooks noted in the email that he still needed a response regarding whether the Door satisfied AR 190-51. (R4, tab G-16 at 18)

40. COR Brooks then contacted the Door manufacturer directly on July 25, 2017. The manufacturer confirmed that the Door did not comply with AR 190-51, Appendix B-3. (R4, tab G-46 (Brooks decl.) at ¶ 18) On July 25, 2017, COR Brooks contacted Heery and informed it that a class 5 door would be needed to comply with AR 190-51, Appendix B-3 (R4, tab G-16 at 20-21).

41. Contrary to Heery's assertion, we find that the speed at which the government responded to Heery regarding the Door and the Walls was reasonable because of the complexity of the issues and the time it took Heery to respond to government concerns.

42. On July 26, 2017, Heery emailed COR Brooks requesting a directive to install a class 5 door (app. supp. R4, tab A-94).

43. On August 10, 2017—11 business days after Heery's request—ACO Blanchard provided formal direction to Heery to change the Door to comply with AR 190-51, Appendix B (R4, tab 4.07). Given its short duration, we conclude that that 11 business-day response-time was reasonable.

44. Heery subsequently installed a class 5 door, (R4, tab 6.02 at 10962), and the security mesh (R4, tab 2.01 at 64-67).

45. Heery achieved substantial completion of the replacement medical center on October 31, 2019—669 calendar days after the December 31, 2017 modified CCD. Therefore, the government withheld $1,011,528 (669 calendar days x $1,512 per day) in liquidated damages. (R4, tab 8.05)

III. Procedural History

46. On March 14, 2018, Heery submitted a request for an equitable adjustment (REA) seeking $49,814—representing the cost of correcting the Door and the Walls—and 124 days of concurrent delay for the alleged government-directed change of reinforcing the Door and the Walls (R4, tab 4.09 at 1-3).

47. The government denied the REA on July 15, 2019 (R4, tab 4.10).

48. On July 29, 2019, Heery submitted a request for a COFD on its REA, which Heery subsequently certified (R4, tabs 2.01-2.02).

49. On November 25, 2019, the CO issued a COFD denying the claim (R4, tab 1.02). Heery received the COFD on December 2, 2019 (R4, tab 1.03).

50. On February 25, 2020, Heery appealed that decision to the Board (R4, tab 1.01).

## DECISION

Heery argues that the government constructively changed the contract documents and breached its duty of good faith and fair dealing, such that Heery is entitled to an equitable adjustment for its increased costs of, and time required for, performance; and remission of the liquidated damages. It is the contractor's burden to prove that the government constructively changed contract documents, *CDM Constructors, Inc.*, ASBCA No. 60454, 18-1 BCA ¶ 37,190 at 181,011, breached the duty of good faith and fair dealing, *Kelly-Ryan, Inc.*, ASBCA No. 57168, 18-1 BCA ¶ 36,944 at 180,034, or caused or contributed to a delay, such that the contractor is entitled to remission of the liquidated damages imposed for that delay. *Atlantic Maintenance Co.*, ASBCA No. 40454, 96-2 BCA ¶ 28,323, at 141,415. As discussed in greater detail below, Heery has not met its burden of showing that the government caused or contributed to the delay by constructively changing the contract documents, or breaching the duty of good faith and fair dealing.

I. Heery has Failed to Meet its Burden of Proving That the Government Constructively Changed the Contract Documents

Heery has failed to meet its burden of proving that the government constructively changed the contract documents. In order to establish that there was a constructive change, a contractor must show that: (1) an official compelled it to perform work not required under the terms of the contract; (2) the official directing the change had contractual authority to alter the contractor's duties unilaterally; (3) the official enlarged the contractor's performance requirements, and (4) the added work was not volunteered,

11

but resulted from the official's direction. *Alfair Dev. Co.*, ASBCA Nos. 53119, 53120, 05-2 BCA ¶ 32,990, at 163,515. "Where as a result of the Government's misinterpretation of contract provisions a contractor is required to perform more or different work, or to higher standards, not called for under its terms, the contractor is entitled to equitable adjustments pursuant to the Changes Article, including extensions of time." *Emerson-Sack-Warner Corp.*, ASBCA No. 6004, 61-2 BCA ¶ 3,248, at 16,827. However, a contractor must show that the change caused its increased costs or delay. *Stewart & Stevenson Servs., Inc.*, ASBCA No. 43631, 98-1 BCA ¶ 29,653 at 146,925.

In determining what work a contract requires, "clear and unambiguous [contract provisions] must be given their plain and ordinary meaning, and we may not resort to extrinsic evidence to interpret them." *Coast Fed. Bank, FSB v. United States*, 323 F.3d 1035, 1040 (Fed. Cir. 2003) (*en banc*). We construe "the contract so as to effectuate its spirit and purpose giving reasonable meaning to all parts of the contract." *ECCIC Metag, JV*, ASBCA No. 59031, 15-1 BCA ¶ 36,145, at 176,418. "An ambiguity exists when a contract is susceptible to more than one reasonable interpretation." *E.L. Hamm & Assoc., Inc. v. England*, 379 F.3d 1334, 1341 (Fed. Cir. 2004). If a contract is ambiguous, we may look to the parties' pre-dispute interpretations of the contract. As we have noted, "the interpretation of an agreement before a controversy has developed is entitled to great weight . . . ." *Sundstrand Corp.*, ASBCA No. 51572, 01-1 BCA ¶ 31,167 at 153,956; *see also Blinderman Constr. Co. v. United States*, 695 F.2d 552, 558 (Fed. Cir. 1982) (same). Thus, a party may be bound by its interpretation of an unclear contract provision during performance. *See Head, Inc.*, ASBCA No. 39824, 92-1 BCA ¶ 24,755 at 123,518.

Here, as discussed in greater detail below, Heery has not met its burden of showing that the government compelled it to perform work not required under the terms of the contract. Even if it had made such a showing, Heery's constructive change claim still would fail because it has shown neither that any change caused its increased costs and delay, nor that any change enlarged Heery's performance.

A.  Heery has not met its Burden of Showing That the Government Compelled it to Perform Work not Required Under the Terms of the Contract

Heery argues that the government compelled it to perform work not required under the terms of the contract because the government directed Heery to construct Room 1919 in accordance with the Controlled Substances Vault Standards, when the contract documents did not require it to do so (app. br. at 80-81, 117). That argument ignores the fact that it was the *combination* of the contract documents' requirements that Room 1919 be a vault for the storage of controlled substances, and that vaults for the storage of controlled substances comply with the Controlled Substances Vault Standards, that mandated that Room 1919 comply with the Controlled Substances Vault Standards.

First, the contract documents required that Room 1919 be a vault for the storage of controlled substance. It is true that the contract documents were ambiguous about

12

whether Room 1919 had to be a vault, and whether the Air Force would use that vault to store controlled substances (findings ¶¶ 9-10). On the one hand, the original PFD and the 0039 RFP drawings indicated that Room 1919 was a "Secure Storage Vault." On the other hand, the original PFD assigned Room 1919 the SSC01 room code that UFC 4-510-01 used for a Secure Storage, Cage, and the 0039 RFP drawings used a dashed-line for Room 1919's walls. (Findings ¶¶ 9-10) Moreover, the original PFD was ambiguous about whether Room 1919 would store controlled substances. The original PFD merely stated that the Medical Logistics Department would provide acquisition and inventory control services by receiving and storing materials in bulk stores areas, without any indication one way or the other whether those materials would include controlled substances (finding ¶ 9).

However, prior to the controversy, the parties interpreted the contract documents as requiring that Room 1919 be a vault for the storage of controlled substances. In particular, at and after the design charrette—at which Heery's proposal had promised Heery would validate the layout of individual departments and track the flow of medication (finding ¶ 13)—the government corrected the drawings to use solid-line walls for Room 1919, corrected the PFD to use room code SSV01 for Room 1919, and informed Heery that Room 1919 would store controlled substances (findings ¶¶ 17, 20).[9] More importantly, Heery agreed to the government's interpretation of the contract documents as required that Room 1919 be a vault, as evidenced by the facts that Heery showed Room 1919 as a "vault," with the SSV01 room code and solid-line walls in its 35 percent, 65 percent, and 100 percent designs (findings ¶¶ 21, 24). Further, Heery agreed to the government's interpretation of the contract documents as requiring that that vault store controlled substances, as evidenced by the facts that its design charrette meeting minutes acknowledged that the Medical Logistics Department would store "[n]arcotics," and it repeatedly responded to government inquiries by stating that "[a] vault was provided for in the warehouse area [Medical Logistics Department] *to house*

---

[9] The parties do not address whether the government's interpretation of the contract documents as requiring that Room 1919 be a vault for the storage of controlled substances was an interpretation made by an individual with authority to do so. However, we note that, at a minimum, ACO Blanchard—who had the authority to interpret or change the contract documents (finding ¶ 16)—ratified that interpretation or change of the Air Force and COR Brooks because ACO Blanchard knew of that interpretation or change by participating in the design charrette and being copied on the January 9, 2014 email, and did not object to that interpretation or change under circumstances when he should have done so. (findings ¶¶ 19-20); *see also Winter v. Cath-Dr/Balti Joint Venture*, 497 F.3d 1339, 1347 (Fed. Cir. 2007); *Harbert/Lummus Agrifuels Projects v. United States*, 142 F.3d 1429, 1433-34 (Fed. Cir. 1998); *L.C. Gaskins Constr. Co.*, ASBCA No. 58550 *et al.*, 17-1 BCA ¶ 36,780 at 179,294; *Brown Constr. Co.*, ASBCA No. 22648, 79-1 BCA ¶ 13,745 at 67,368.

*high-target medications* that are received in the facility" (findings ¶¶ 17, 23 (emphasis added)). Thus, Heery is bound by its pre-dispute interpretation of the contract documents as requiring that Room 1919 be a vault for the storage of controlled substances.

Second, the contract documents required that vaults used for the storage of controlled substances—such as Room 1919—comply with the Controlled Substances Vault Standards. The contract documents required that Heery comply with UFC 4-510-01, which in turn mandated that vaults for the storage of controlled substances comply with the Controlled Substances Vault Standards (findings ¶¶ 5-7).[10] Because the contract documents required that vaults for the storage of controlled substances comply with the Controlled Substances Vault Standards, the government did not compel Heery to perform work not required under the terms of the contract documents when it directed that Room 1919 comply with the Controlled Substances Vault Standards.

Heery argues that the contract documents' use of the term "vault," had no legal significance (app. br. at 81-82, 88). That argument ignores our obligation to look at the plain language of the contract documents, and to construe them so as to give reasonable meaning to all their parts. *Coast Fed. Bank*, 323 F.3d at 1040; *ECCI-C*, 15-1 BCA ¶ 36,145, at 176,418. It also ignores the fact that UFC 4-510-01 assigned significance to the term vault by imposing particular requirements for vaults (finding ¶ 5).

Similarly, Heery argues that it merely used the term "vault" in its designs because that was the term the government used, and Heery did not want to cause confusion (app. br. at 31). However, Heery was responsible for the professional quality and the technical accuracy of its designs, and it had to exercise the standard of care an ordinary member of the architecture or engineering profession would use (finding ¶ 3). Again, the use of the term vault had significance because UFC 4-510-01 imposed particular requirements for vaults (finding ¶ 5). A reasonable professional would have recognized the significance of using the term vault—particularly when coupled with its use of the SSV01 room code used in UFC 4-510-01 (findings ¶¶ 21, 24)—because it was the contractor's duty to ensure compliance with that standard (finding ¶ 5). Thus, having agreed in its designs to provide a vault, it was Heery's obligation to ensure that that vault complied with UFC 4-510-01.

Also meritless is Heery's argument that, under the order of precedence clause, the UFC 4-510-01's room codes take precedence over the drawings' "vault" language (app. br. at 20). It is the inconsistency between the *drawings*' room code and the *drawings*'

---

[10] In particular, UFC 4-510-01 requires that vaults comply with: (1) AR 190-51, which requires that vaults for the storage of controlled substances comply with AR 190-51, Appendix B-3 (finding ¶ 6); and (2) 21 C.F.R. § 1301.72, which sets standards for vaults for the storage of controlled substances (finding ¶ 7).

vault language—and not between the *UFC 4-510-01*'s room code and the *drawings'* vault language—that created the ambiguity (finding ¶ 10). Because the inconsistency was within the same document, the order of precedence clause does not help resolve that inconsistency (finding ¶ 4).

Heery also argues that the government never informed Heery that the government changed Room 1919's room code to SSV01 (app. br. at 92). That is incorrect. The government informed Heery of that change by expressly highlighting the room code change in the list of PFD changes (finding ¶ 20). Indeed, the facts that Heery acknowledged that the revised PFD changed Room 1919's room code to SSV01 and that all of Heery's designs use room code SSV01 for Room 1919, show that Heery was aware of the change (findings ¶¶ 21, 24).

In its reply brief, Heery argues that UFC 4-510-01 did not require that vaults comply with 21 C.F.R. § 1301.72 because the language in UFC 4-510-01 providing that "[f]eatures to be considered for vault storage areas are outlined in 21 C.F.R. § 1301.72" is not mandatory (app. reply. at 86-87; finding ¶ 7). As an initial matter, Heery waived that argument by failing to raise it in its opening brief. *Hannon v. Dep't of Justice*, 234 F.3d 674, 680 (Fed. Cir. 2000). In any event, that argument is meritless. "The words 'act to be done' must be read 'act required to be done . . . .'" *Moore v. Los Angeles Iron & Steel Co.*, 89 F. 73, 76 (S.D. Cal. 1898). The act at issue here—to "consider[]"— means "[t]o fix the mind on, with a view to careful examination; to examine; to inspect. To deliberate about and ponder over. To entertain or give heed to." BLACK'S LAW DICTIONARY, 306 (6th ed. 1990). Thus, UFC 4-510-01's "to be considered" language mandated that Heery examine, inspect, entertain, and give heed to the features in 21 C.F.R. § 1301.72. And indeed, Heery's architect admits that 21 C.F.R. § 1301.72 governed the storage of controlled substances (finding ¶ 8). In any event, the argument is beside the point because Heery does not dispute that AR 190-51, Appendix B-3 applied to vaults for the storage of controlled substances (app. reply at 86-87).

In its reply brief, Heery also argues that 21 C.F.R. § 1301.72 did not require that Room 1919 comply with 21 C.F.R. § 1301.72(a)'s requirements for vaults because 21 C.F.R. § 1301.72(b) permitted the use of a cage for schedule III, IV, and V controlled substances (app. reply at 40). Heery waived that argument by failing to raise it in its opening brief. *Hannon*, 234 F.3d at 680. In any event, the argument is meritless. While Heery is correct that 21 C.F.R. § 1301.72(b) permitted the use of a cage for schedule III, IV, and V controlled substances, it mandated that, if a vault was used for schedule III, IV, and V controlled substances, that vault had to comply with 21 C.F.R. § 1301.72(a) (finding ¶ 7). And, as discussed above, the government clarified that Room 1919 would be a vault, and Heery agreed that Room 1919 would be a vault (findings ¶¶ 17, 20-21, 23-24). Therefore, having agreed to a vault—and not a cage—21 C.F.R. § 1301.72(b) required Heery to construct that vault in accordance with 21 C.F.R. § 1301.72(a), regardless of which schedule controlled substances that vault would hold (finding ¶ 7).

In any event, the argument is beside the point because AR 190-51, Appendix B-3 required the use of a vault for the storage of all controlled substances, regardless of schedule (finding ¶ 6).

Heery also argues in its reply brief that it was impossible for Room 1919 to comply with both AR 190-51, Appendix B-3 and 28 C.F.R. § 1301.72(a) (app. reply at 84-86). Again, Heery waived that argument by failing to raise it in its opening brief. *Hannon*, 234 F.3d at 680. And, again, the argument is meritless. Heery could comply with both AR 190-51, Appendix B-3's 8 inches or 9 inches on center wall reinforcement requirement and 21 C.F.R. § 1301.72(a)'s 6 inches on center wall reinforcement requirement by complying with the stricter 21 C.F.R. § 1301.72(a) requirement (findings ¶¶ 6-7). Moreover, Heery has failed to show that AR 190-51, Appendix B-3's requirement that Heery install a class 5 door or a door that provides equal or greater delay was substantially different than 21 C.F.R. § 1301.72(a)'s requirement for a door that provides for 30 man-minutes against surreptitious entry, 10 man-minutes against forced entry, 20 man-hours against lock manipulation, and 20 man-hours against radiological techniques (findings ¶¶ 6-7). To the extent AR 190-51, Appendix B-3 imposed a stricter standard, Heery could have (and did) comply with both the AR 190-51, Appendix B-3 and 21 C.F.R. § 1301.72(a) by complying with the stricter AR 190-51, Appendix B-3 requirements. Thus, Heery has failed to meet its burden of showing that the government compelled Heery to perform additional work not required under the terms of the contract documents.

B. <u>Even if the Government Had Changed the Contract's Requirements, That Change Would Not Have Caused Heery's Increased Costs and Delay</u>

Even if the government had compelled Heery to perform additional work (which was not the case), that would not have caused Heery's increased costs and delay. If there was a change, it would have been having Room 1919 be a vault for the storage of controlled substances because, as discussed above, that triggered Heery's obligation to ensure that the vault comply with the Controlled Substances Vault Standards.

As discussed above, that was not a change. But even if it were, that change occurred at and immediately after the design charrette because that is when the government clearly communicated to Heery its interpretation that Room 1919 was a vault for the storage of controlled substances (findings ¶¶ 17, 20). And indeed, Heery knew of, and agreed to, any changes by using the term "vault," the SSV01 room code, and solid-line walls for Room 1919 in its 35 percent, 65 percent, and 100 percent designs; acknowledging in its design charrette meeting minutes that the parties agreed that Room 1919 would store "[n]arcotics;" and repeatedly assuring the government that Room 1919 would be a vault for the storage of high-target medications (findings ¶¶ 17, 21, 23-24). Because Heery knew of—and agreed to—any change of having Room 1919 be a vault for the storage of controlled substances well before it commenced construction

16

of Room 1919, it was Heery's failure to satisfy its obligation of ensuring that that vault complied with the Controlled Substances Vault Standards—and not any change in the room's characteristics—that caused any increased costs or delays resulting from the correction of the non-compliant door and walls. Having failed to show that any change caused any increased costs or delay, Heery's constructive change claim must fail. *Stewart & Stevenson*, 98-1 BCA ¶ 29,653 at 146,925.

Heery argues that the government could not enforce the requirements that Room 1919 comply with the Controlled Substances Vault Standards because the government approved Heery's 100 percent design and inspected the work (app. br. at 95-102; findings ¶¶ 25-26). "The government cannot properly be blamed for approving the design when appellant failed to inform the government that its design deviated from Task Order . . . requirements." *EEC Int'l, LLC*, ASBCA No. 58875, 20-1 BCA ¶ 37,683 at 182,966. Similarly, "[w]here the contract places on the contractor the burden of compliance, the presence or absence of a Government inspector does not shift responsibility for the sufficiency of the work from the appellant to the government." *Panhandle Grading & Paving, Inc.*, ASBCA No. 38539, 90-1 BCA ¶ 22,561 at 113,225. Here, prior to the government's approval of the 100 percent design, Heery did not inform the government—and thus the government was not aware—that the Door and Walls did not comply with the Controlled Substances Vault Standards (finding ¶ 26). Moreover, it was the obligation of Heery—and not the government—to ensure that the Door and the Walls complied with the Controlled Substances Vault Standards (findings ¶¶ 5-7). Indeed, the MATOC Contract expressly stated that "[n]either the Government's review, approval or acceptance of, nor payment for, the services required under this contract shall be construed to operate as a waiver of any rights under this contract or of any cause of action arising out of the performance of the contract" (finding ¶ 3). Thus, the government's approval of the 100 percent design and inspection of the work did not relieve Heery of its obligation to ensure that Room 1919 complied with the Controlled Substances Vault Standards.

### C. Even if the Government Had Changed the Contract Requirements, Heery has not Shown That any Change Enlarged its Performance Requirements

Even if the government had changed the contract requirements, Heery has not shown that any change enlarged its performance requirements. As discussed above, any change was requiring that Room 1919 be a vault for the storage of controlled substances. Even assuming that the contract documents did not require that Room 1919 be a vault for the storage of controlled substances, the contract documents still unambiguously would have required one vault for the storage of controlled substances, and the government only insisted on one vault for the storage of controlled substances (findings ¶¶ 9-10, 43). While the unambiguously-required vault originally was in the Pharmacy Department (findings ¶¶ 9-10), and the government ultimately insisted on a vault in the Medical Logistics Department (finding ¶ 43), Heery has presented no evidence that any moving of

the vault increased its costs or the time required for construction. On the contrary, the fact that Heery made the conscientious decision not to seek an equitable adjustment for any change during the design phase (finding ¶ 22)—despite agreeing to provide a vault for the storage of controlled substances in the Medical Logistics Department (findings ¶¶ 21, 23-24)—strongly suggests that any changes to the vault did not increase the cost, or time, required to perform. Because Heery has not shown that any change enlarged its performance requirements, its constructive change claim must fail. *Alfair*, 05-2 BCA ¶ 32,990 at 163,515.

## II. The Government did not Breach its Duty of Good Faith and Fair Dealing

The government did not breach its duty of good faith and fair dealing (*see* app. br. at 107-15). Every contract imposes upon each party a duty of good faith and fair dealing in its performance and enforcement. *Future Forest, LLC v. Sec'y of Agriculture*, 849 Fed. App'x 922, 926 (Fed. Cir. 2021). The duty includes a duty not to interfere with the other party's performance, and not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract. *Metcalf Constr. Co. v. United States*, 742 F.3d 984, 991 (Fed. Cir. 2014). A party cannot use the duty of good faith and fair dealing to expand another party's contractual duties beyond those in the express contract, or to create duties inconsistent with the contract's provisions. *Future Forest*, 849 Fed. App'x at 926. However, a failure to respond to a contractor within a reasonable time may breach the duty of good faith and fair dealing. *Relyant, LLC*, ASBCA No. 59809, 18-1 BCA ¶ 37,085 at 180,539 (holding that a four-month delay between a revised request to modify a statement of work and the government issuing that modification was unreasonable, and breached the duty of good faith and fair dealing).

Here, Heery first argues that the government breached its duty of good faith and fair dealing by failing to identify Room 1919's defects earlier (app. br. at 109-12). However, Heery cannot use the duty of good faith and fair dealing to create a duty to notice Room 1919's defects because that is inconsistent with the contract documents' provision that it was the obligation of Heery—and not the government— to ensure that Room 1919, as a vault for the storage of controlled substances, complied with the Controlled Substances Vault Standards (findings ¶¶ 5-7).

Heery also argues that the government breached the duty of good faith and fair dealing by failing to direct Heery to install a class 5 door earlier (app. br. at 109-15). As in *Relyant*, we look to the date the contractor submitted a specific request in determining whether the government's response-time was reasonable. 18-1 BCA ¶ 37,085 at 180,539. Here, Heery did not request formal direction regarding the Door until July 26, 2017 (finding ¶ 42). The ACO provided the requested direction 11 business days later on August 10, 2017. Heery has failed to prove that the 11 business day delay was so unreasonable as to breach the duty of good faith and fair dealing. (Finding ¶ 43)

18

Even if we were to look at the government's conduct prior to the request, there was no unreasonable delay. Between the government's first bringing the issue of the Door to Heery's attention on May 9, 2017, and Heery's requesting formal direction on July 26, 2017, the government communicated extensively with Heery about whether the Door met the Controlled Substances Vault Standards, the contract documents required a class 5 door, a modification was required, and an alternative remedy was available (findings ¶¶ 28-42). Heery has failed to establish that the government was unreasonably slow in its exchanges with Heery (finding ¶ 41). On the contrary, Heery appears to have been more responsible for the length of time it took to resolve the Door issue. For example, after its May 11, 2017 email, Heery did not email the government about the Door again until 47 days later—on June 27, 2017—despite repeated inquiries about the Door from the government (findings ¶¶ 29, 37). Likewise, Heery's failure to provide a direct response to the government's repeated inquiries about whether the Door met the Controlled Substances Vault Standards appears to have significantly contributed to the length of time the discussions took (findings ¶¶ 30, 33, 39). Because Heery has failed to show that the government unreasonably delayed responding to it, it has failed to meet its burden of proving that the government breached its duty of good faith and fair dealing.

CONCLUSION

For the foregoing reasons, the appeal is denied.

Dated: September 15, 2021

JAMES R. SWEET
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

J. REID PROUTY
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

19

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 62420, Appeal of CBRE Heery, Inc., rendered in conformance with the Board's Charter.

Dated:  September 15, 2021

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals